# 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

## CHARLES LEMONS *vs.* THE STATE

### January Term, 1870.

1. When the constitution of the State requires an indictment to conclude in certain form and words, the indictment is not good unless it concludes in the exact language of the constitution.

2. A prisoner, by failing to demur, or moving to quash, or moving in arrest of judgment, on an indictment not in the exact language required by the constitution, cannot be held to have waived his right to make objections to the indictment in the appellate court; the right being a constitutional, and not a personal right.

3. When the character of a witness for truth and veracity has been impeached, the evidence of a witness who has been acquainted for a long time with the impeached, and has never heard the character of said witness for truth and veracity questioned, is admissible, although said witness may never have heard any person or persons say anything whatever concerning said impeached witness' character.

Charles Lemons was indicted in the circuit court of Greenbrier county, on the 12th day of June, 1869, for stealing a horse from Daniel Rogers. The indictment concluded "against the peace and dignity of the State of *W.* Virginia." On the 13th day of June, 1869, the prisoner was arraigned, and pleaded not guilty, and the jury found him guilty and fixed his term of imprisonment at two years in the penitentiary.

During the progress of the trial, numerous exceptions were taken, both to the introduction and exclusion of evidence, and also to many proceedings in the case, all of which were properly certified and ordered to be made part of the record; but nearly all of the exceptions were waived by the

counsel on the trial of the case before this court. The case was heard upon the two following exceptions: 1. 'The indictment was not good because it did not conclude 'against the peace and dignity of the State of *West* Virginia.'" 2. "Proper evidence was rejected."

During the progress of the trial below, Thomas McAllister was introduced by the prisoner, to sustain the character of N. A. McDowell, who had been impeached by the State; the witness, in answer to questions, said, "that he was acquainted with the reputation of N. A. McDowell, among her neighbors, for truth and veracity, and also, that he had never heard her character for truth questioned; that he had never heard any one say anything about her character for truth and veracity, though he had known her for fifteen years;" but the court rejected this testimony, and refused to let it go to the jury; to which ruling the counsel for the prisoner excepted; and it is upon these exceptions that the case is decided in this court.

*Jas. W. Davis* for the plaintiff in error.
*Attorney-General Caldwell* for the State.

BERKSHIRE, J. This is a writ of error to the judgment of the circuit court of Greenbrier county. The defendant, now plaintiff in error, was indicted, tried, and convicted of felony, for the larceny of a certain horse of the value of 150 dollars, belonging to Daniel Rogers.

The defendant, without any demurrer or motion to quash, pleaded not guilty to the indictment, and no motion was made in arrest of judgment. He, however, moved the court to set aside the verdict and grant him a new trial, upon sundry grounds set forth in the bill of exceptions taken to the opinion of the court for overruling the motion.

The first error assigned and insisted on is, an objection to the indictment because it fails to conclude, against the peace and dignity of the State of *West* Virginia, as required by the provisions of the constitution of the State.

The fifth section of the first article of the constitution provides that indictments *shall* conclude, "against the peace and dignity of the State of West Virginia." It will be seen, therefore, that the precise words for the conclusion of all indictments, are prescribed in this provision, and the quotation marks, which are superadded, would indicate a purpose that a strict and *literal* compliance in the exact language of the constitution would be required. The conclusion of the indictment in the present case is, "against the peace and dignity of the State of *W.* Virginia." This is not, therefore, a literal compliance, and consequently is insufficient, in my judgment, to satisfy the constitutional requirement. But considering the indictment to be bad, it was nevertheless insisted, on behalf of the State, that by failing to demur or move to quash or in arrest of judgment, the defendant must be deemed to have waived all objections to the indictment, and is thereby excluded from making, for the first time, the objection here. This, it must be conceded, presents a very grave and difficult question; and in my examination of the authorities on this point, I have not found them numerous, nor entirely satisfactory and decisive.

In *Rex* v. *Cook*, 1 Russel & Ryan, p. 176, the accused was indicted for larceny. The indictment did not conclude *contra pacem*, but against the form of the statute in such case made and provided. The prisoner being convicted, moved in arrest of judgment, because of the insufficiency of the indictment in not concluding *contra pacem*. It was held by nine of the twelve judges constituting the court, that the indictment was bad, and the judgment was accordingly arrested. Chief Justice Mansfield, Lord Ellenborough, and Justice Wood, expressed *doubts,* but did not formally dissent from the judgment entered.

In *Matthew's case*, and *Garner's case,* 18 Gratt., 989, it was held that, "anything which is good cause for arresting a judgment, is good cause for reversing it, though no motion in arrest be made." In these cases, the defendants, Matthews and Garner, were tried and convicted for murder,

(the former in the first and the latter in the second degree), upon an information filed in the county court of Fairfax county, by the attorney for the commonwealth, upon his oath of office. They elected to be tried separately, and each of them pleaded not guilty to the information. At the instance of the prisoners, they were remanded to, and tried in, the circuit court. On the trial of Matthews, no question whatever was raised or reserved, and the only question made in the case of Garner, was an exception taken to the opinion of the court for overruling a motion for a new trial. Each of the prisoners applied for and obtained writs of error, on the hearing of which the judgment of the circuit court was reversed; the court deciding, that under the act of April, 1867, a person could not be tried for a felony except upon an indictment found by a grand jury, in a court of competent jurisdiction.

In the argument of these cases, it was maintained by the attorney-general, as in this case, that, if the prisoners were entitled to require the proper finding of an indictment against them, before they could be put on trial for the offence with which they were charged, yet that it was a *personal* privilege which they could and *did* waive, by pleading not guilty to the information, without objection, and by omitting to make any motion in arrest of judgment. But the court, after intimating a doubt whether it was *such* a privilege as that they *could* waive it, (especially if it was a *constitutional* right), held that there was no evidence of any such waiver, or intention to waive the privilege, and that the accused were not bound to make the objection by motion in arrest of judgment, but might make it for the first time in that court, notwithstanding the omission to make such motion in the circuit court.

In the case of *Cancemi* v. *The People*, 18 N. Y. Rep., 129, the accused was tried and convicted for murder in the first degree. After the trial had commenced and progressed for some time, at the instance of the prisoner, and with his consent, in writing, which was made part of the record, one of the jurors was withdrawn, and the trial proceeded with

the remaining eleven, who returned a verdict of murder in the first degree, and the sentence of death was pronounced against the prisoner. The case was taken, by appeal, from the supreme to the court of appeals, and one of the most important questions raised and considered was, whether it was competent for the prisoner to waive, as he had attempted to do, his right to be tried by a *legal* jury, consisting, according to the principles of the common law, of 12 men. On behalf of The People, it was insisted that the prisoner had a clear right to waive his privilege of being tried by a legal jury, and having done so expressly and voluntarily, he was precluded from making the objection in the appellate court. But, the court ruled otherwise, and held that the right of the prisoner to be tried by a full jury of twelve persons, was a constitutional right which could not be waived, and that his consent to do so was a nullity and his conviction illegal; and the general proposition was strongly maintained, that in criminal cases, the constitutional rights of the accused cannot be waived by him, nor be disregarded by the court.

Under the weight of these authorities, and after the fullest consideration that I have been enabled to bestow on the question, I am brought to the conclusion that we would not be warranted in holding in the case under consideration, that the defendant has waived his right to object to the indictment for the want of the constitutional formality.

Another leading error relied on, was the ruling of the court in rejecting the testimony of the witness Thomas McCallister, offered by the prisoner to sustain the character of Nancy Ann McDowell, another witness introduced by him, whose reputation for truth and veracity had been impeached by the State. This error is disclosed by the defendant's 2d bill of exceptions, and if well assigned, was sufficient cause for setting aside the verdict, as it would also be for reversing the judgment for such improper ruling.

It appears that when the witness McCallister was introduced, the usual question, whether he was acquainted with

the general reputation of the witness, McDowell, for truth and veracity among her neighbors, was propounded to him, and having answered in the affirmative, the question was then propounded to him, by the court, whether he had ever heard any person speak of her character for truth and veracity, and the witness thereupon replied, (in substance), that he had known her for fifteen years, and had never heard her character, in this respect, questioned, and had never heard any person say anything about her character for truth and veracity; and thereupon the court excluded the witness as incompetent to testify in behalf of the defendant, as to the character of the witness, McDowell, for truth and veracity.

The question, therefore, is presented, whether a person who may be well acquainted with a witness in the community in which he lives, (whose character for truth and veracity has been impeached), and has never heard the character of such witness, in this respect, called in question or spoken of, is nevertheless a competent witness to sustain the witness and rebut the evidence of bad character which may have been introduced against such witness? This is a question of much practical importance, and on this account, it is deemed proper that it should be settled by the judgment of this court.

In the case of *Buckie* v. *The State of Ohio*, 20 Ohio Rep., it was held, that where a witness was called to impeach a witness called on the other side, such impeaching witness could only speak of the *general* reputation in the community for truth and veracity of the witness sought to be impeached; and in delivering the opinion of the court, Justice Caldwell says: "As to the charge of general bad character, if untrue, every person in the neighborhood can give specific evidence rebutting it. If not able to state *affirmatively* the person is well spoken of in the neighborhood, the witness can state that he *knows* of no such general bad reputation, which goes *directly* to rebut the allegation of its existence."

The rule established in this case, it seems to me, is founded

in manifest good sense and justice, and it would seem difficult to assign any sufficient reason why it should not be applied to the case under consideration. Here the witness for the prisoner had been impeached, or attempted to be impeached, by the State, for the want of truth and veracity, and, in my apprehension, no more direct, appropriate, and effective evidence to rebut the charge of bad character could be produced, than the testimony of persons who, though for many years, were well acquainted with such witness in the neighborhood where she resided, had never heard her character, in this regard, called in question, or spoken of in the community. If the contrary doctrine contended for were to be adopted, it appears to me it must lead to this strange anomaly, that persons of the very highest honor and integrity would find it very difficult, if not impossible, to sustain their general reputation for truth and veracity among their neighbors, (should it chance to be ever called in question), from the very fact that they have lived so far beyond the breath of suspicion, that no occasion had ever arisen to call in question their characters for truth and veracity, or cause them even to be spoken of in the community; and the absurdity of the rule becomes more apparent when it is remembered, that the more unsullied and exalted the character, the less likely it is ever to be called in question, or spoken of with respect to truthfulness, and consequently more difficult to sustain than characters of far less worth, *because* the latter had been the subject of conversation and speculation in the community, while the former had not. Thus it is seen that the rule insisted on, would require that before a person would be able to fortify and sustain his reputation for truth, should it ever be drawn in question, he must first show that it had been called in question or talked about among his neighbors, and that a witness who had never heard it questioned or spoken of, however well acquainted he may be with such person and the community in which he lives, is, for this reason, incompetent to prove or sustain the good character of such person, or to rebut the evidence

of bad character that may have been introduced against him; a principle that involves such absurd results, it seems to me, cannot be well founded, and I feel constrained, therefore, to reject it. On the contrary, it appears to me, that a person who should prove, by those in his community by whom he is well known, that his reputation for truth and veracity has never, so far as he knows, been called in question or talked about among his neighbors, might well claim, in the absence of evidence to the contrary, to have shown, at least a *prima facie* case of good character in this respect, and to have produced the most direct and satisfactory evidence, to rebut evidence of bad character, in case any may have been produced against him.

I am therefore of opinion that the court committed an error in rejecting the testimony of the witness McCallister, offered in support of the reputation for truth and veracity of the witness McDowell. Numerous other errors were assigned, but as they were waived by counsel, it is unnecessary to consider them.

I think the judgment should be reversed, the indictment quashed, and the case remanded to the circuit court for further proceedings.

The other judges concurred.

JUDGMENT REVERSED.