### STATE *v.* MEADOWS.

#### Decided November 19, 1881.

1. Where a witness is introduced to impeach the general reputation of another witness for truth and veracity in his neighborhood, and he states, that he is acquainted with his general reputation in that regard, that it is bad, and that he would not believe him on oath, he is a competent witness, notwithstanding he can not say he has heard a majority of his neighbors speak of his character in that regard.

2. Having made those statements he is competent, and as to what his opinion is founded on is a matter for cross-examination and for the consideration of the jury as to the weight to be given to his testimony.

3. A witness having in answer to the usual questions stated, that he was acquainted with the general reputation of another witness for truth and veracity, that that reputation was bad, and that he would not believe him on oath, it is competent to ask him, whether he had ever heard a majority of his neighbors speak of his character.

4. It is competent to ask such a witness, if his opinion is made up from his own knowledge, or from what he has heard the neighbors say.

5. A person is indicted for shooting another with intent to maim, disfigure, disable and kill him, and under ¿ 1 ch. 29 Acts 1881, takes the stand as a witness in her own behalf, it is competent to ask her, with what intent she shot at the person she tried to shoot.

6. On the trial of an indictment for maliciously or unlawfully shooting a person " with intent to disfigure, disable and kill" him it is error to instruct the jury, that if they believe the shooting was done "with intent to maim, disfigure, disable or kill him, *or to cause him bodily injury*," they must find a verdict of guilty.

7. It is not error for the court to instruct the jury on such an indictment, that under ¿ 22 ch. 159 of the Code, they can acquit of the felony and find the prisoner guilty of the attempt to commit such felony.

8. If A is indicted for shooting C with intent to maim, disfigure, disable and kill him, and the proof is, that he shot at B and missed him and accidentally hit C, he can be convicted on such indictment for shooting C with intent to maim, disfigure disable and kill him.

9. If A be indicted for an attempt to shoot C with intent to maim, disfigure, disable and kill him, and C is not in fact shot, and the proof is, that the attempt was to shoot B and not C, he cannot be convicted of an attempt to shoot C.

Writ of error to a judgment of the circuit court of the county of Boone, rendered on the 9th day of April, 1881, in an action in said court then pending, wherein the State of West Virginia was plaintiff, and Artemisia Meadows was defendant, allowed upon the petition of the said Meadows.

Hon. D. E. Johnston, judge of the ninth judicial circuit, rendered the judgment complained of.

The facts of the case appear in the opinion of ~~the opinion~~ of the Court.

*W. E. Chilton, Jr.,* for plaintiff in error, cited the following authorities :   1 Greenl. Ev. § 461 ; 2 Phil. Ev. (4th Am. ed.) 955 ; Stephen's Dig. "Ev." Part. III, Art. 133 ; 5 W. Va. 510 ; 1 Arch. Cr. Pr. & Pl. 639, 640 ; Code, ch. 144, §9 ; 2 Arch. Cr. Pr. & Pl. (6th ed.) 263, 264 ; Code, ch. 152, §§ 1, 9, 22 ; 1 Russ. on Crimes (5th ed.) 740, 741 ; 11 W. Va. 703 ; 9 Gratt. 485 ; 1 Bish. Cr. Law § 735 ; *Id.* § 97 ; 1 Bish. Cr. Pr. § 485 ; *Id.* § 1060 ; 1 Hawley Am. Cr. Rep. 249 ; Const. W. Va. Act III, § 5 ; Const. U. S. 5th Amendment.

*Joseph E. Chilton* for defendant in error.

PATTON, JUDGE, announced the opinion of the Court:

Artemisia Meadows was indicted in the circuit court of Boone county under section 9, chapter 144 of the Code. That section provides: "If any person maliciously shoot, stab, cut or wound any person, or by any means cause him bodily injury, with intent to maim, disfigure, disable or kill, he shall * * * be punished by confinement in the penitentiary not less than two nor more than ten years. If such act be done unlawfully but not maliciously with the intent aforesaid, the offender shall at the discretion of the jury either be confined in the penitentiary not less than one nor more than five years or be confined in jail not exceeding twelve months and fined not exceeding $500.00." She was charged in the indictment with maliciously shooting one Francis M. Meadows with the intent to maim, disfigure, disable and kill him. The indictment is in the usual form under the statute. On the 9th day of April, 1881, the case was tried by a jury, which rendered a verdict. "We the jury find the prisoner not guilty of the felony charged in the indictment; but we find the prisoner guilty of an attempt to commit the felony charged in the indictment and assess her fine at $100.00 and fix the term of her imprisonment at six months in the county jail." The prisoner moved the court in arrest of judgment and for a new trial; but the court overruled both motions and gave judgment against the accused for the amount of said verdict, and ordered her to be confined in the county jail for the period of six months.

From this judgment of the court, she obtained a writ of error to this Court:

In the progress of the trial four bills of exceptions were taken in behalf of the prisoner, which will be noticed in the order, in which they were taken. The first bill states in substance, that a witness was introduced in behalf of the prisoner to impeach the general reputation of one of the prosecuting witnesses for truth and veracity, "who testified on his examination in-chief, that he knew Francis Meadows, commonly called Dock Meadows; that he knew his general reputation for truth and veracity among his neighbors and in the community, where he is known; that his reputation was bad, and that from such knowledge of his reputation for truth and

veracity he would not believe him, the said Francis Meadows, on oath, where interested." On his cross-examination this witness stated, that "he had heard two of his neighbors speak of having heard the said Francis ———— swear a lie; that he himself had never heard him swear a lie; that among others, whom he had heard speak of witness Francis swearing a lie; was one Robert Toncy, a justice; that he had also heard Robert Hunter say, he, Hunter, had heard said Francis tell a wilful lie; that he thought he had heard others speak of his character for truthfulness, but did not know, that he could now recall their names; that he, witness, however had not heard a majority of the said Francis's neighbors speak of said Francis's character for truthfulness." The court excluded this testimony from the jury; and the prisoner by counsel excepted.

The only ground for excluding this evidence, which has been suggested, is that the witness stated, that he had not heard a majority of the neighbors of the prosecuting witness speak of his character for truthfulness. If this was a test of the competency of a witness introduced to impeach the general reputation of another witness, it would be a practical bar against impeaching the veracity of witnesses, as it would require a poll of a man's neighbors within a given territory of uncertain extent and limits. The more notorious a man's bad character for truth and veracity, the less likely a witness called to impeach it is to be able to recall the names and number of those, from whom his knowledge of his general reputation is derived. When one or two persons mention a fact of a startling character, it so fixes the attention and arouses the mind, as to lodge in the memory the time, place, circumstances and the persons who communicated it. as to make them all subjects of easy recall to the mind. But as the number increases, and the occasions are repeated, the mind ceases to retain the details of the fact, which has become a subject of common report, public opinion and general reputation in a neighborhood; until to trace it to individual sources becomes a matter of practical impossibility.

General reputation is mere public opinion (Parsons, C. J., in *Boynton* v. *Kellogg*, 3 Mass R. 192) and is a term convertible with common report, per Gibson, J., in *Kimmel* v. *Kimmel*,

3 Serg & R. 337.   Public opinion and common report and general reputation may be of such long standing, that when it began, how rapidly it spread and how universal it has become, is ordinarily not susceptible of solution.   On the other hand the witness's knowledge of the general character of the person attacked may be of recent origin and based upon slight evidence and derived from few and unworthy sources. It is therefore a fair subject of investigation in weighing the value of the testimony, to ascertain the sources, from which that knowledge is derived ; and the opinion of the witness will be more or less valuable as the circumstances show his opportunities for forming the opinion were well founded or not.   It has been held in *Lemons* v. *The State*, 4 W. Va. 755, that the best evidence, that a person's general reputation for truth and veracity in his neighborhood is good, is the fact, that his character in that regard has never been called in question or talked about ; and the evidence of a witness to that character is admissible, though the witness has never heard any person or persons say anything whatever concerning it.   I think a man's general reputation for truth and veracity may be so bad and notorious, that a witness may be permitted to testify to it without being able to state the sources, from which that knowledge of the general reputation is derived.   If he cannot do so, it is a matter for the jury to take into consideration in weighing his testimony and in determining its value as in any other case.

Reputation is not made up or established by any particular acts ; and hence the law confines the evidence to the question of general reputation and will not permit evidence of specific acts, for it is not a question as to the grounds, upon which that general reputation is founded, or whether well or ill-founded, but as to whether as a matter of fact that reputation exists.   No man's general reputation is established or lost by any one or more particular acts; but it is by his general deportment and conduct aggregated and leaving upon the mind as a whole the impression that the character is good or bad, as the case may be.   The rule is well settled, that when a witness introduced to impeach the character of another witness testifies that he is acquainted with such witness's general reputation for truth and veracity in his neighborhood,

it is competent to follow that evidence up with the statement, that it is good or bad, and that he would or would not believe him upon oath. The answer to these questions makes him a competent witness.

In this case the questions were propounded to the witness; and his answers are given in the very language laid down in the books. This testimony having been given, the credibility of the witness giving it was liable to attack upon cross-examination to ascertain the grounds of the unfavorable opinions, and in doing that he may be interrogated as to his opportunities for knowing the reputation of the impeached witness, as to how long and how generally the unfavorable reports have prevailed, and from what particular individuals he has heard them. This range of cross-examination would seem to be sufficient to show, if such was the fact, that the imputed bad reputation was artificial and created to answer a particular purpose. To authorize further enquires would very much embarrass and delay trials and probably in no respect subserve the ends of justice. *Uhl et als.* v. *The Commonwealth,* 6 Gratt. 706 ; *Lemons* v. *The State,* 4 W. Va. 755 ; *Clay* v. *Robinson, adm'r,* 7 W. Va. 348 ; *The People* v. *Mather,* 4 Wend. 229 ; 1 Greenl. Ev. § 461 ; 4 Phil. Ev. Cow. & Hill's notes pt. 2, 757.

The circuit court erred in excluding this testimony.

The second bill of exception shows, that a witness was introduced on behalf of the prisoner to impeach the general reputation of a witness of the prosecution for truth and veracity, and having been asked the usual questions, and having responded, that he knew his general reputation for truth and veracity, that it was bad, and that he would not believe him upon oath, upon his cross-examination he was asked by the court: "Have you heard a majority of those, among whom he, Francis (Dock) Meadows, moves, and with whom he associates and is best acquainted, speak of him ?" to which the witness replied, "I think so." It seems to me, that it was a perfectly proper question to be asked the witness; it was a mode of testing the extent of the information possessed by the witness, upon which he based his opinion of the character of the impeached witness; it was not a question affecting his competency but the weight to be given to his testimony,

as it would have been competent to ask him, if he but had heard all the neighbors speak of his character or how many of them, whether one or more; and upon the answer to these questions it was for the jury to determine, how far they affected his credibility or the weight to be given to his testimony. The witness however answered, that he thought he had heard a majority of the neighbors speak of him. The court did not exclude the testimony, as was done in the case set out in the first bill of exceptions. Considering the an-. swer I do not see how the prisoner was injured, even if the question was improper.

I do not think the court erred in asking and permitting the witness to answer that question.

In the same bill of exceptions it appears, that the witness was asked: " Is your knowledge of Francis (Dock) Meadows's standing for truth and veracity, as stated by you, made up from what you have heard his neighbors say or from your own knowledge of him ?" To which he replied : " Well, sir, it is a little of both." To which question and answer the prisoner by counsel excepted. This was a proper question to be asked. If the opinion of the witness was made up from his own transactions and dealings with the party impeached, the opinion expressed was merely the result of his own conclusions. The rule is well settled, that this is not evidence, upon which to destroy a man's reputation. Temper, prejudice, malice and all the baser feelings of the human heart would have an opportunity to vent themselves upon an enemy, if his reputation could be assailed by a witness's own opinion of what his character is. The question is not, what the witness thinks, but what his neighbors generally say of him. The witness may think his character good and yet know, that his general reputation is bad. He may think, that his character is bad, yet be compelled to say the community generally considers it good. What he thinks is a matter of no moment ; what the community thinks is the question.

The question then was a proper one. The answer of the witness was, that his opinion was partly founded on each ground. This will in fact be the case in most instances of impeaching witnesses drawn from the same neighborhood and being acquainted with and having dealings with the party im-

peached; and it is a fair subject for the consideration of the jury, how far the personal feelings and views of the witness have colored, and biassed his opinion in testifying to a mere fact, which he is supposed to testify to without regard to his own views, or how far those views do not color or affect his testimony as to the fact, what other people think and say on the subject. It in no wise differs from any other question of fact, as to which a witness may be called on to speak. He may allow his own views and feelings to color the statement of the fact, to which he testifies, and it is for the jury to determine how far this will affect the accuracy and reliability of his testimony. I think the question was a proper one, and the answer also. The exception of the prisoner to this question and answer was not well taken.

The third bill of exceptions states substantially, that the prisoner, Artemesia Meadows, was introduced as a witness in her own behalf, and testified among other things, that at the time of the alleged shooting she fired three shots in all, one upon the public road before reaching Francis (Dock) Meadows's house and in a different direction from the house in simply a careless spirit, the other two shots she fired while passing his house on the public highway, and after he had accosted her with abusive language and in an angry manner, and immediately after he had thrown a rock, which struck her in the back and staggered her. She turned immediately and fired the two shots at and towards said Meadows. After giving this testimony she was asked by the court the following questions and gave the following answers: Question: "With what intent did you shoot at Francis (Dock) Meadows, to hit?" Answer: "I did." Question: "And to hurt?" Answer: "I did, I did not want to kill him, but I just wanted to hurt him right bad, for I really was afraid of him." To the questions and answers the prisoner by her counsel excepted. It is not stated upon what ground this exception was taken, presumably upon the ground, that the witness was also the accused, and had some peculiar right to conceal the motives and intent, with which the act stated by her was done, and that the accused may take the stand and testify to what she pleases, and decline to respond to questions tending to criminate herself.

The law authorizing a person accused of crime to testify

in his own behalf provides, that such person "shall at his own request, but not otherwise, be a competent witness; and his failure to make such request shall not create any presumption against him, nor shall any reference be made to, nor any comment be made upon such neglect or refusal." It is entirely a voluntary matter, whether an accused person will testify or not, and a failure to do so shall not be prejudicial to him. . If he avails himself of that privilege and testifies, whether he cannot in all cases be cross-examined and compelled to answer all questions tending to throw light upon his guilt or innocence subject to such rules as govern examinations in chief and cross-examinations in general, and whether in voluntarily assuming the role of witness for the time his relation of accused also must not be lost sight of, and his privileges be limited to those of an ordinary witness, I do not think it necessary to determine in this case.

The question propounded by the court together with the answer of the accused accomplished no more than to give tongue to the presumption, which the law would have raised, if the question had not been asked nor the answer given. Every person is presumed to intend to do that, which is the natural result of his act. To fire a pistol at one is an act, from which the inference must inevitably be drawn, that it was done with the intent to hurt the party shot at. Whether that hurt was intended to be more or less aggravated must depend upon a great variety of circumstances, as for instance, the calibre of the fire-arm used, the distance between the parties, the part of the body aimed at, the motive animating the party and many others, which naturally suggest themselves. Whether it was " with intent to maim, disfigure, disable and kill, or not, is matter to be inferred from the circumstances of the case. The witness only stated the presumption of law raised by her act; and I cannot see, that she has been injured or prejudiced by this question and answer. I do not think the court erred in propounding the question.

The fourth and last bill of exceptions sets forth all the evidence given upon the trial of the cause and the instructions given and refused by the court with the exceptions upon the part of the prisoner by counsel. Without repeating the whole of this testimony it will be sufficient to say, that the evidence

showed, that there was ill feeling existing between the prisoner and Francis (Dock) Meadows; that previous to the shooting he had made threats of personal violence towards her and in her presence; that in consequence of those threats she had borrowed a pistol and carried it for her protection; that on the evening the shooting occurred, the prisoner was returning home from a neighbor's, where she had gone to take a dress, which she had made for her neighbor; that when she was about one hundred yards from his house, walking along the road singing, she carelessly and merely to hear the sound of the pistol fired once up the mountain side; that at the time she fired the shot, the dog of Francis (Dock) Meadows had barked and come to her, but he was not dangerous, and she was not afraid of him; that as she came along the road by his house, Meadows demanded to know, if she had not fired at his house or dog, which she denied; that she continued along the road, he keeping along with her inside of his fence, until they reached the upper corner of his house, when two shots were fired by the prisoner at Meadows; that between the shots he ran behind the smoke-house, and she ran up the road; that during the firing of the two shots Francis M. Meadows, the son of Francis (Dock) Meadows, came out of the house and said: " Mish, this is me you are shooting at," to which she replied, " I don't care a durn who it is;" that between the prisoner and Francis M. Meadows the most friendly relations existed; that when she made this reply, he rushed into the house, got a rifle and shot at her, as she ran up the road. She also testified, that before she fired, Francis (Dock) Meadows struck her with a rock. This he denied.

He testified, that one of the bullets struck Francis M. Meadows; "that it did not break or bruise the skin but grained it causing the loss of no blood whatever; that said bullet passed into his shirt a little below and at the bottom of the opening in said shirt, and came out about two inches square to the left, making two bullet holes in the shirt, and of this he was positive, because he had examined the shirt afterwards and had worn it afterwards."

Francis M. Meadows testified, "that one of the bullets passed through his shirt over his stomach, and that as it passed he felt the sting, making a red mark on his stomach without

breaking, scarring or bruising the skin ; " \* \* \* \* "that the bullet aforesaid penetrated his said shirt at the opening of his shirt in front, and coming out about two inches across from the left of said opening, making ,but one bullet-hole in said shirt; and of the fact, that there was but one bullet-hole, he was positive, and could not be mistaken, as he had examined the shirt afterwards carefully, and had in fact worn the shirt afterwards until it was worn out."

The prisoner testified, " that the said Francis M. was not shot, that he was not standing in the range of her pistol ; that she did not shoot at Francis M., nor attempt to shoot him ; that she and Francis M. were the best of friends."

Evidence was also introduced impeaching the character of Dock Meadows for truth and veracity and none to sustain him.

Upon this state of facts the court instructed the jury, that if they believed from the evidence, that the prisoner maliciously shot the prosecuting witness, Francis M. Meadows, as charged in the indictment, with intent to maim, disfigure, disable or kill him, or to cause him bodily injury, then they should find the prisoner guilty, &c. The second instruction is similar to the first, except that it directs, that if the act was done unlawfully but not maliciously, &c. These two instructions may be properly considered together.

It is obvious, that these instructions were wrong. The statute provides, that if any person maliciously or unlawfully " shoot, stab, cut or wound any person or by any means cause him bodily injury with intent to maim, disfigure, disable or kill." The essence and gist of the statutory offence is the intent with which the act may be done. If any of the acts be done, the party may be liable as for a common law offence ; but without the intent, as laid down in the statute, there could be no conviction under the statute. The intent mentioned in the statute must be " to maim, disfigure, disable or kill," not any other intent. Under this statute proof of intent to rob, to commit a rape, or any other offence known to the law except to " maim, disfigure, disable or kill," would not satisfy the terms of the statute. If an act is made criminal by statute, only when done with a particular intent, this intent must be averred and proved according to the terms of

the statute. 1 Arch. Cr. Pr. & Pl. (8th ed.) 273; *State* v. *Malloy*, 34 N. J. 410; *Commonwealth* v. *Dana*, 2 Metc. 329; *Miller* v. *The People*, 5 Barb. 203. In alleging a statutory offence it is generally necessary to describe the offence in the very language of the statute. *Howell's case*, 5 Gratt. 664; *Commonwealth* v. *Woodson*, 9 Leigh 669; *Derieux* v. *Commonwealth*, 2 Va. Cas. 379; *State* v. *Malloy supra*. In Davis's Criminal Law 141 it is said, according to the express language of both the sections of this statute, the prohibited acts must be committed with " intention to maim, disfigure, disable or kill." The principle, that if a person in the attempt to commit one felony shall commit another, his felonious intention shall be connected with his felonious act, appears therefore inapplicable, where an act within the description of this statute accidentally ensues in the prosecution of a different kind of a felony.

The instructions in adding to the words of the statute, "or to cause him bodily injury" were clearly erroneous. It was an instruction to the jury, that upon an indictment for one offence, they might convict of another and a wholly different offence, not prescribed by the statute, under which the indictment was found. A person might do any of the acts with intent to do *less* bodily harm than to "maim, disfigure, disable or kill," which are made felony; and under these instructions, be convicted of felony for a mere misdemeanor.

The third instruction given by the court and the first instruction asked in behalf of the prisoner will be considered together. But first I will dispose of the second instruction asked for by the prisoner's counsel and refused, viz : " The court instructs the jury, that if they believe the prisoner intended and attempted to shoot only Francis (Dock) Meadows, then they cannot convict the prisoner of an *attempt* to commit the felony charged, and must acquit the prisoner."

The question intended to be raised by this instruction, is thus stated in the very able brief of the counsel for the plaintiff in error:

" There is no doubt, that shooting F. with intent to shoot D. is an offence. But the question here presented is, whether or not, under an indictment charging one with shooting F. with intent to maim, &c., F., proof that the accused intended

to shoot D., but accidentally shot F., will support the allegations of the indictment. The last is purely a question of pleading and evidence. If a person shoot at one person with intent to maim, &c., and accidentally hit and maim another, it is a crime; and conviction would follow upon a proper indictment. But this principle of law does not conflict with the equally well-settled principle that a man cannot be arraigned upon one charge and convicted of another.

"The apparent difficulty seems to have grown out of a confusion of the *substance* and the *pleading.* The cases referred to in some of the older authorities, as in Russell for instance, are not at my command; but it is believed, that their apparent conflict will be explained by the fact, that one set of cases affirms the doctrine in the abstract, that a man may intend one crime and commit another; while the other set of cases, not denying this principle, hold, that persons cannot be convicted, because the offence proved differs from that charged and constitutes a separate and distinct crime to be pleaded accordingly. The opinions of Parke B. and Alderson B. referred to in 1 Russell 741 with reference to the "intent to poison a certain person" after reviewing the cases preceding it, concur in support of the view here presented. Undoubtedly a person may intend and attempt to commit one offence and actually commit another, for which he is equally amenable to the law; but this doctrine does not conflict with the salutary rule that every crime must be so charged as to enable the defendant, 1st, to meet it intelligently; and 2d, to plead it in bar of a subsequent prosecution in case of a conviction or acquittal. Here the defendant is arraigned upon an indictment for shooting with intent to maim, &c., Francis M. Meadows; and meeting that charge successfully, as the whole record will show, she is convicted of an intent and attempt to maim, &c., Dock Meadows, a different and distinct person."

The rule is well settled, that if one person shoot at another with intent to kill him and miss that person and kill a third person, it is murder. The malicious intent towards the second is transferred to the third upon the well-settled principle, that a man shall be presumed to intend that, which he actually does. I can see no distinction between the degrees

of the act—between murder and maiming, and when the statute creates a new criminal offence, the common law rules as to crimes generally attach to it, so far as they are applicable to that character of crime.  If A shoots at B with intent to maim, disfigure, disable or kill him, but misses B and maims, disfigures, disables or kills C, his wicked intent towards B is transferred to C, and A is presumed to have originally intended to do that, which he actually did do.  Davis in his Criminal Law 142 after using the language before quoted says: "If however a man striking at another with such an evil intent, as would make him guilty of this offence, if the person struck at had been hurt, happen to miss that person and strike and maim a third person, he will be equally guilty, as if he had intended to strike the latter, in like manner as if a person, who commits one species of maiming in the attempt to perpetrate another, is as guilty of that which he commits, as if he had intended it."  These remarks are made on the construction of a statute, substantially like the present statute, contained in the Revised Code of Va. ch. 156 § 1, and he refers to 1 Russell.

In the case of *Rex* v. *Hunt,* East (T. R.) 1825, cited in 1 Russ. 739, Hurst was indicted under a statute, 43 Geo. III, chapter 58, " with intent to murder Cambridge."  The evidence was, that in an attempt to kill Headley he cut Cambridge with a knife.  It was held, he could be found guilty under this statute.

In the case of *Rex* v. *Holt,* 7 C. & P. 609, Holt was indicted for shooting at Hill "with intent to murder," but he did not hit him.  The proof was, that he mistook him for Lee, whom he intended to kill.  It was held, that the indictment could not be sustained.  Littledale, J., in summing up said: " There is no doubt, that the prisoner shot at Mr. Hill; and if death had ensued, the offence would have amounted to murder.  Then it will be for you to say, whether the prisoner intended to do Mr. Hill some grievous bodily harm.  It certainly appears, that he did not do so in point of fact.  However, the law infers, that a party intends to do that, which is the immediate and necessary effect of the act, which he commits."  It is plain, that the ground, upon which the prisoner was directed to be acquitted, was that Hill was not struck.

If he had been, the prisoner would have been held responsible upon the principle, that "the law infers, that a party intends to do that, which is the immediate and necessary effect of the act, which he commits."

In 1 Arch. Cr. Pr. & Pl. 271, it is said in discussing statutes similar to ours and to those, under which the cases above referred to were decided : " But if a man fire at A. and shoot B., he may be indicted for shooting and discharging the pistol or gun against B. ; for in fact he did so." The author refers to *Rex* v. *Holt*, *Rex* v. *Jarvis*, 2 Mood. & R. 40 ; and *Regina* v. *Smith*, 33 Eng. Law & Eq. 567. In *Rex* v. *Jarvis* Jarvis and Longdon were indicted for shooting Lockeyer with intent to murder. The proof was, that they shot at Hale and missed him and hit Lockeyer. They were found guilty. It was held : " An indictment under 9 Geo. IV, ch. 31, § 12, for maliciously shooting at A. B. is supported, if he be struck by the shot, though the gun be aimed at a different person." In the case of *Regina* v. *Smith*, decided in 1855, Smith was convicted upon an indictment charging him with wounding Taylor with intent to murder him. The proof was, that the prisoner intended to shoot one Maloney, and supposing Taylor to be Maloney shot at and wounded Taylor ; the conviction was held good. It was held : " If intending to murder A. and supposing B. to be A. a person shoots at and wounds B., he may be convicted of wounding B. with intent to murder him."

In the case of *Rex* v. *Lewis*, 6 C. & P. 161, Lewis was indicted for administering poison to Davis with intent to murder. The proof was, that the poison was intended for Mrs. Davis and was left on the counter with directions for it to be delivered to Mrs. Davis. It was held, that if it was intended for Mrs. Davis and found its way to Mr. Davis and he took it, the crime is as much within the act of Parliament, as if it had been intended for Mr. Davis. If a person sends poison with intent to kill one person, and another takes that poison, it is just the same, as if it had been intended for such person.

Subsequently this case was doubted by Parke, B., in *Regina* v. *Ryan*, 2 Mood. & R., 213. In that case Ryan was found guilty under an indictment charging her with causing poison to be taken by George Power with intent to murder the said Power. The evidence showed, that the prisoner's intention

was to murder Catherine Power.  Parke, B., afterwards said he had spoken to Alderson, B., on the subject, and that both much doubted, whether the verdict could be supported, the averment of the intention not being proved as laid.  He was aware, there was a case, where under the old law (9 Geo. IV, c. 31, § 11) a conviction had taken place, though there was a similar defect in the evidence, (*Rex* v. *Lewis*), but he doubted the propriety of that decision ; and to provide for any such case, the language of the new statute, under which the prisoner was tried (1 Vict. ch. 85, § 2), had been altered ; for under that section it was sufficient to allege, that the prisoner did the act *"with intent to commit murder"* generally.  He directed a new indictment to be prepared.  This is the case referred to by counsel in his brief as quoted in 1 Russ. 741. The case of *Rex* v. *Lewis*, is in accord with the principles of the other cases, to which I have referred, none of which are referred to by Parke, B., in *Regina* v. *Ryan*.

In a note to 1 Russ. on Crimes (7th Am. ed. 3d Lond. ed.) 743, in speaking of the case of *Regina* v. *Ryan*, and some other cases, where it was held, that where a person wounds one person by accident intending to murder another, he may be found guilty of " intent to murder" the person actually struck, the author says : " The case of poisoning one person by mistake for another seems different, if the poison be taken in the absence of the prisoner ; for in such case he can have no actual intent to injure the person."  However sound this distinction may be, I think the cases all agree, as far as I have discovered, that in cases of an attempt to do an injury to one, and the injury is actually done to another, under a statute which provides, that if an act is done " with intent " to do the injury, an indictment will lie for doing the injury to the one actually injured " with intent " to do it to him.

The third instruction given by the court was, that if the jury " believe from the evidence in this cause, that the prisoner is not guilty of the felony charged in the indictment, but guilty of an attempt to commit such felony, then they shall fix the term of her imprisonment in the county jail at not less than six nor more than twelve months and fix the fine at not exceeding $500.00."  The Code ch. 152 § 22 provides, that upon conviction for a misdemeanor the jury shall fix the

fine, and the court the time of confinement in the jail. It was therefore erroneous to instruct the jury to ascertain the time of confinement in the jail. But it was not an error for which the case could be reversed, the court having the right to fix the time of confinement and to ignore that part of the verdict. It was mere surplusage and in no way prejudiced the prisoner's rights. With this exception the instruction propounds the law correctly.

But the counsel for the accused asked the court to instruct the jury, " that if they acquit the prisoner of the felony charged in the indictment, they cannot convict of an attempt to commit the felony, unless they be satisfied beyond a reasonable doubt, that the prisoner attempted to shoot *Francis M. Meadows*, as charged in the indictment, and not some other person." The court refused this instruction. While it is by no means free from doubt, whether under a statute punishing an act done with a specific intent, the intent towards one may not be transferred to the one actually injured, (*vide* in addition to the authorities before referred to, *Barcus* v. *The State*, 1 Haw. Cr. R. 249; *Hollywood* v. *People*, 2 Abb. App. Dec. 376; *Callahan* v. *The State*, 21 Ohio St. 306), there can be no doubt, both upon principle and authority, that where no actual injury is received, the attempt to commit the act must in the indictment be alleged to have been made against the person actually intended, and not some other person.

In the case of *Rex* v. *Holt*, before referred to, where the prisoner intending to shoot Lee shot at Hill but missed him, and was indicted for shooting at Hill with intent to murder, it was held, that he could not be convicted, because the proof was he did not intend in fact to shoot Hill. If he had hit Hill, it would have been otherwise. Lord Littledale asked the jury, if they found, that he intended to do harm to Mr. Hill. The foreman of the jury replied: "We find he did not intend to do any harm to Mr. Hill." Lord Littledale: "A verdict of not guilty must be recorded." An allegation of an attempt to shoot one cannot be sustained by proof of an attempt to shoot a different person. The attempt is the offence charged, and if the proof was not confined to the attempt upon the person named, it would be impossible for the accused to prepare for his defence. It would be the same, as

if one was indicted for the murder of A. and it was proved, that he murdered B. a wholly different offence.

The distinction is clearly stated in 1 Bish. Cr. Law, § 730. "To constitute murder, the guilty person need not intend to take life; but to constitute an attempt to murder, he must so intend." In the first case the law presumes an intention; in the latter case the intention must be actual. In the one case a man is presumed to intend to do what he does; in the other the act is without injury in itself, and only becomes wrong, when the intent is wicked. In attempts therefore the intent must be specific to do a particular act, which, if it were fully performed, would constitute a substantive crime. "The doctrine of an intent in law differing from the intent in fact is not applicable to these technical attempts; and if the prisoner's real purposes were not the same, which the indictment specifies, he must according to views already explained be acquitted. To hold otherwise would be unjust and absurd." Bish. Cr. Law § 735.

It was error in the court to refuse to give the instruction asked for.

Under the provisions of our Constitution, and as this case must be reversed and sent back to the circuit court for a new trial, it was necessary to notice each point that arose upon the record.

The judgment of the lower court must be reversed, the verdict of the jury set aside and the case remanded to the circuit court for a new trial to be had therein.

THE OTHER JUDGES CONCURRED.

JUDGMENT REVERSED.     CASE REMANDED.