## VANDIVER v. STATE.

No. A-11791. Sept. 23, 1953.

(261 P. 2d 617.)

Coffey, Lassiter & Coffey, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., and Lewis J. Bicking, County Atty., Tulsa County, Tulsa, for defendant in error.

POWELL, P. J. Eugene Vandiver was tried and convicted by a jury in the district court of Tulsa county, where he was charged by information with the crime of assault with intent to commit a felony: Kidnapping. He was sentenced to serve one year in the county jail and to pay a fine of $500 and costs. The case is here on appeal.

The charging part of the information reads:

" * * * that Eugene Vandiver on the 12th day of September, A.D. 1951, [in Tulsa County] * * * did unlawfully, wilfully, wrongfully and feloniously commit the crime of assault with intent to commit a felony, to-wit: Kidnapping, by forcibly and without the consent of one Mrs. C. J. Bridges, grab her, and with force did seize Mrs. C. J. Bridges without lawful authority then and there attempting to place her in his automobile intending to secretly confine or imprison Mrs. C. J. Bridges against her will in this State, contrary to the form of the statutes * * *."

Appellant argues all the allegations or errors set out in his petition in error under one proposition, rather than under separate specifications of error. Counsel

would do well to comply with the rules of this court, Rule 7, 22 O.S.A. c. 18 Appendix, with reference to form and structure of briefs. Some of the points not necessary for a solution of the case will not be treated; others only briefly, as authorized by Tit. 20 O.S. 1951 § 47, as amended, Laws 1953.

The argument of appellant that the court erred in not sustaining the demurrer and motion to quash based on the insufficiency of the evidence to bind the defendant over for trial and also his motion to suppress the evidence cannot be sustained. Only the prosecuting witness testified at the preliminary hearing. It is elemental that a person may be bound over at the preliminary hearing to answer the charge in the district court on evidence that would not be sufficient to support a conviction. It is our conclusion that probable cause was shown. Tit. 22 O.S. 1951 § 171; McAllister v. State, 97 Okla. Cr. 167, 260 P. 2d 454; Taylor v. State, 79 Okla. Cr. 115, 152 P. 2d 123; Lyon v. State, 55 Okla. Cr. 226, 28 P. 2d 598; McCurdy v. State, 39 Okla. Cr. 310, 264 P. 925.

We conclude from an examination of the information that it contains allegations covering every essential element of the crime of assault with intent to kidnap, and that the allegations are sufficient to apprise the accused of the nature of the charge, and the court did not err in overruling the demurrer to the information. McCoy v. State, 92 Okla. Cr. 412, 223 P. 2d 778.

This brings us to the vital issue in the case where it is urged:

"The court further erred for the reason that the evidence was wholly insufficient to support the verdict, since there was a complete failure of an essential element of proof, that is, there is absolutely no evidence showing the defendant intended to secrete Mrs. Bridges but instead showed he intended to take her to buy a beer."

The evidence developed that on the evening of September 11, 1951, at about 8:30 or 9 o'clock, Mrs. C. J. Bridges, age 23, a married woman and the mother of two children, was bodily picked up by the defendant and cradled in his arms. She had been standing at the northwest corner at the intersection of Thirteenth and Elgin, in Tulsa, waiting for a bus. Pertinent excerpts from her testimony are as follows:

"Q. Just tell us what you first noticed there. Just tell what was said, or what was done by you or others. A. I was standing alone, waiting on this bus and a car drove up, a light blue Buick, and stopped within about three feet from the curb. It didn't pull up to the curb and this man opened his door and stooped down and I supposed he was checking his rear tires and then he got up and walked up to me and he asked me if I wanted a lift, and I said 'No, I am waiting on the bus', and he just stooped down and picked me up and I started struggling with him and he had this left arm pinned down and I was hitting him with my fist with my right arm in the head. Q. Now, that corner of that intersection is in Tulsa County, Oklahoma? A. Yes, sir. Q. Do you know whether anything further was said by you or this defendant? A. No, sir, that was all. * * * Q. Where did he grab you? Whereabouts on your body? Show the jury the best you can where he grabbed you. A. He must have put his arm around my back and under my legs and picked me up in his arms. * * * Q. Now another matter: Do you remember about how many times you hit the man? A. No, sir. I was just fighting him. Q. Do you know whether you finally broke loose or whether he set you down or whether he dropped you? A. He put me down. Q. He put you down? A. Yes, sir. Q. Prior to the time the defendant put you down, had you heard any other outcry or outside interference? A. While we were struggling, we fell back against some bushes and while we were back there and I was struggling to get down, this man started across the street and he whistled and that is when the man put me down. Q. After this other fellow whistled? A. Yes, sir, and he was coming towards us at the time he whistled. He was in a car across the street, cata-cornered from where we were and he got out of his car

and started over there and he whistled and that evidently was when the man put me down. Q. He put you down immediately after he heard the whistle? A. Yes, sir. * * * Q. Did you see any one else around there up to that point? A. I know I noticed before it happened, there was a man standing down on the other corner, about a block away, waiting on the bus. Q. That is on west on Thirteenth? A. Yes. Q. After you struggled and got over into the bushes and the man whistled and this man put you down, what next happened? A. He started chasing me."

Witness stated that a man started rapidly walking over from across the street and other people commenced coming up and defendant got in his car and drove away.

On cross-examination witness stated that defendant drove up to within a yard of the curb where she was standing and stopped his car and leaned out of his car as if to look at his rear tire and then got out and went to the back of his car, looked at his tires, and he then stopped in front of her and asked if he might give her a lift, and offered to take her to get some beer. She further testified:

"Q. Did you go in any direction after he picked you up? A. Yes, sir. Q. Which way? A. Back. Q. Back away from the car? A. Yes, sir. Q. About how far backwards did you go? A. As far as the sidewalk."

D. C. Kimbrall, an accountant, was across the street from the prosecuting witness and saw the defendant pick her up and then put her down when someone called out to him. He could not hear the conversation, and otherwise was corroborative of the evidence of Mrs. Bridges as to the conduct of the defendant.

Mrs. T. N. Turney testified that she lived on Elgin street about 75 yards from where she saw the defendant pick up Mrs. Bridges, at the time charged. She stated that she "hollered" to her husband to call the police, which he did, and she screamed for help and defendant put Mrs. Bridges down. Mrs. Bridges then started to run, and defendant chased her and then got in his car and left.

Officers Norman and Jackson testified concerning the arrest of the defendant.

Policewoman Beulah Johnson attempted to get a written statement from the defendant after his arrest, advising him of his constitutional rights not to make a statement, and he decided not to make one, but did make some oral statements. The jury was excused and witness stated:

"And we asked him if he had not been down to Thirteenth and Elgin the night before, and he said 'Yes' that he had just grabbed this woman and tried to get her to go with him to get a bottle of beer."

The court ruled this evidence admissible, but when the jury returned the county attorney would not again ask the question.

This closed the evidence for the state.

Beulah Johnson was then called as a witness for the defendant. She stated that she questioned defendant concerning the charges against him. She further testified:

"Q. Did he tell you in regard to why he stopped there and what he did? A. Yes, sir. Q. What was it? A. He said he got out of the car and grabbed her and was going to try and put her in his car. Q. For what purpose? A. To get a bottle of beer. Q. A bottle of beer? A. Yes."

The defendant testified that he was thirty-one years old and married, and that he was a house builder in Tulsa. Concerning what happened the night in question, he stated:

"A. I just saw her standing there and I walked over and asked her could I give her a lift or if she would not like to drink a bottle of beer and she said 'No' and I don't know what ever possessed me to ever pick her up, or anything, but I guess I did pick her up. I don't remember too much about it. I was pretty well drunk. Q. Pretty well drunk? A. Yes, pretty well drunk. Intoxicated. Q. You say you must have picked her up? A. Yes, I must have picked her up. Q. Why? A. I don't know. That is what I cannot figure out and then I must have come to my senses, or something, and I set her down and got in my car and drove off. I did start back to apologize to her and then I thought better of it and I thought I had better go on and I went out to the car and then drove off."

Defendant called several character witnesses who testified that his general reputation as a peaceable, law-abiding citizen was good.

At the close of all the evidence, defendant renewed his demurrer first interposed at the close of the state's evidence, based on the ground of the insufficiency of the evidence "to sustain the charge contained in the information, or any other crime", and requested a directed verdict. It was argued that the state failed to produce any evidence of circumstances from which it could reasonably be considered that defendant's intent was attempting to secretly keep or detain Mrs. Bridges. The demurrer was overruled and the requested instruction denied.

The case was prosecuted under Tit. 21 O.S. 1951, §§ 681 and 741, reading as follows:

"§ 681. Every person who is guilty of an assault with intent to commit any felony, except an assault with intent to kill, the punishment for which assault is not otherwise prescribed in this code, is punishable by imprisonment in the State penitentiary not exceeding five years, * * * or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment."

"§ 741. Every person who, without lawful authority, forcibly seizes and confines another, or inveigles or kidnaps another, with intent, either:

"First. To cause such other person to be secretly confined or imprisoned in this State against his will; or,

"Second. To cause such other person to be sent out of this State against his will; or,

"Third. To cause such person to be sold as a slave, or in any way held to service against his will, is punishable by imprisonment in the penitentiary not exceeding ten years. Upon any trial for a violation of this section, the consent thereto of the person kidnapped or confined, shall not be a defense, unless it appears satisfactorily to the jury, that such person was above the age of twelve years, and that such consent was not extorted by threat, or by duress."

We do not find where this court has previously been called upon to construe Section 741 of the above statute, though it was in force in Oklahoma Territory in 1890 and after statehood was re-enacted as Section 2300 of Comp. Laws 1909.

This statute, covering kidnapping, was borrowed from Dakota Territory, where it appears as Comp. Laws Dak. 1887, § 6474. There is evidence that Dakota Territory modeled its statute from a similar statute in force in the State of New York. Penal Law, McK. Consol. Laws, c. 40, § 1250.

In construing its statute, the Court of Appeals of New York, in People v. Camp, 139 N.Y. 87, 34 N.E. 755, 756, stated in the body of the opinion that:

"*When the person seized or inveigled is not removed from the state, the intent must be secret confinement within the state.*" (Emphasis supplied.)

In that case, the person seized was taken in broad daylight and in view of others and removed over public highways and railroads to a public asylum.

The State of Utah enacted a statute covering kidnapping, Comp. Laws Utah, 1917, §. 8040, subd. 1, modeled on the New York statute, and the Supreme Court of that state in State v. Olsen, 76 Utah 181, 289 P. 92, following the construction of the New York court in People v. Camp, supra, in paragraphs 4 and 6 of the syllabus, held:

"Unlawful seizure of person with intent merely to confine or imprison him within state is not 'kidnapping' within statute (Comp. Laws 1917, § 8040, subd. 1). * * *

"To authorize conviction for kidnapping' within statute, it must be alleged and proved accused intended to secretly keep or detain person seized against his will (Comp. Laws 1917 § 8040, subd. 1)."

The Supreme Court of Alabama in Doss v. State, 220 Ala. 30, 123 So. 231, 68 A.L.R. 712, construed its statute against kidnapping, Code 1923, § 3189, which contained a clause, "with the intent to cause him to be secretly confined, or imprisoned against his will" etc. In reporting this case in 68 A.L.R. at page 716, the editor in headnote No. 2 construes the rule to be:

"The existence of an intent secretly to confine another or to cause him to be sent out of the state, against his will, is an essential element of the offense denounced by a statute prescribing a punishment for any person who forcibly or unlawfully confines, inveigles, or entices away another, with the intent to cause him to be sent out of the state against his will; and if there is no evidence of such criminal intent a conviction for violation of the statute cannot be sustained."

The Alabama court went on to say:

"The dominating element of the offense of kidnapping, like the statutory felony of assault with intent to murder, is the intent with which the acts enumerated in the statute are done, to-wit: 'With the intent to cause him to be *secretly* confined or imprisoned against his will, or to be sent out of the state against his will,' and the adverb 'secretly' qualifies each of the verbs 'confined' and 'imprisoned,' clearly indicating a legislative purpose to denounce as a felony any surreptitious restraint of one person by another in such sort as to deprive the subject of the crime 'of the friendly assistance of the law to relieve himself from captivity.' 1 Rus. Cr. 961; Smith v. State, 63 Wis. 453, 23 N.W. 879.

" 'Kidnapping at common law is defined to be the forcible abduction or stealing away of a man, woman or child from their own country and sending them into another,' and is treated as an aggravated species of false imprisonment. 4 Black Com. 219; 1 East, P.C. 430. To abduct is 'to take away surreptitiously by force;' to steal is 'to accomplish by stealth and concealment.' Webster's New Int. Dict."

In the note following the above case as reported in 68 A.L.R. and at page 720 thereof, the authorities are reviewed, and the conclusion is reached that:

"Secrecy was not an element of kidnapping at common law, and is not an element of the statutory offense of seizing a person with intent to keep or detain him against his will. But on the other hand, the general rule seems to be that secrecy is an element where the statute prohibits seizure with intent secretly to confine the person seized."

The Attorney General concludes that the above is the general rule, but states:

"The evidence showed that defendant committed an overt act when he forcibly seized his victim and tried to put her in his car. When viewed in the light of the entire record, we think the evidence was sufficient to warrant the jury in believing that he intended to force Mrs. Bridges to get into his car for the purpose of driving her to some isolated place and there to secretly confine her, apparently for the purpose of trying to induce her to consent to an act of sexual intercourse."

The county attorney also argued to the jury: "He tried to kidnap her and I assure you on my honor had this woman been put in that automobile, under our Oklahoma law, that would have been 'kidnapping'." The assistant county attorney also argued: "In 'kidnapping' he would have to get her into the car."

In other words, the theory of the prosecution was that to have placed Mrs. Bridges in the automobile against her will would have constituted kidnapping per se; therefore, the attempt to place her in the car over her active protest and resistance, constituted in itself an assault with intent to kidnap. Overlooked altogether was the vital question of secret confinement.

Attorney General cites Tyson v. United States, 7 Okla. Cr. 433, 122 P. 733, and Wilson v. State, 50 Okla. Cr. 310, 297 P. 826. In the latter case this court said:

"Direct evidence of the intent to commit crime is not essential. It may be shown by indirect evidence, as well as direct, and intent is to be gathered from all the facts and circumstances in the case. If the evidence of such intent be made to appear to the satisfaction of the jury beyond a reasonable doubt, that is all the law requires."

In the Wilson case the defendants admitted the acts charged of breaking and entering a home, taking a grip containing various articles of clothing and jewelry and hiding the same under a culvert, but defendants claimed they had no intent to steal the articles but that they were only playing a practical joke on one Clendenning they mistakenly thought lived at the place entered. The question of intent was by a proper instruction appropriately submitted to the jury.

It will be noted that the act charged was accomplished, to wit: The entering and taking of the articles enumerated. It was only necessary for the state to so show in order to make out a case. But the defense contended that it was all a mistake, that the defendants thought they were entering the home of an acquaintance on whom they had planned to play a joke.

It was by reason of the defense interposed that the issue of intent was submitted to the jury.

But in the within case specific intent was an element of the crime charged, and in order to make out a case it was necessary for the state to prove as an independent fact the intent charged. The crime of assault with intent to kidnap could not be assumed by simply proving an assault or assault and battery. The prosecution has failed to distinguish between an intent which is inferred from the act done, when the act does not go beyond the intent, and an intent to commit a greater crime than the act done actually accomplishes.

The attempt to commit a crime consists of two elements: (1) the intent to commit it, and (2) a direct ineffectual act done towards its commission. Here the crime charged consisted of an assault, a misdemeanor, proven by the state and admitted by the defendant, and the higher offense of intent to commit a felony—kidnapping. Would the mere fact that the defendant took Mrs. Bridges in his arms and was therefore guilty of assault, force the conclusion ipso facto that he was going to kidnap her, (which means to take secretly, confine her against her will) any more than that he was going to murder her there on the spot, or take her for a wild ride in his car, or just sit with her in the car? There was no evidence direct or circumstantial of what the intentions of the defendant were beyond holding Mrs. Bridges in his arms, other than his statement that he asked her to go get a bottle of beer. There are many possible ideas that may have been in his mind. But more than speculation is required. We have sought in vain for evidence to support the judgment, but there is no evidence or circumstances to support the judgment or the conclusion or guess advanced by the

Attorney General, which we have heretofore quoted. The law will not presume an intention beyond that realized by the act. See 22 C.J.S., Criminal Law, §§ 32 and 34; State v. Davis, 72 Wash. 261, 130 P. 95; State v. Clark, 98 Wash. 81, 167 P. 84; State v. Louther, 22 Wash. 2d 497, 156 P. 2d 672, and Thacker v. Commonwealth, 134 Va. 767, 114 S.E. 504, 505.

In the latter case, the court said:

"The law can presume the intention so far as realized in the act, but not an intention beyond what was so realized. The law does not presume, because an assault was made with a weapon likely to produce death, that it was an assault with the intent to murder. And where it takes a particular intent to constitute a crime, that particular intent must be proved either by direct or circumstantial evidence, which would warrant the inference of the intent with which the act was done.

"When a statute makes an offense to consist of an act combined with a particular intent, that intent is just as necessary to be proved as the act itself, and must be found as a matter of fact before a conviction can be had; and no intent in law or mere legal presumption, differing from the intent in fact, can be allowed to supply the place of the latter. Roberts v. People, 19 Mich. 401; Maher v. People, 10 Mich. 212, 18 Am. Dec. 781; 1 Whart. Crim. Law, § 316; Vandermark v. People, 47 Ill. 122; Callahan v. State, 21 Ohio St. 306; Kunkle v. State, 32 Ind. 220; State v. Meadows, 18 W. Va. 658; 3 Bish. New Crim. Proceed. p. 1290; Kinnebrew v. State, 80 Ga. 232, 5 S.E. 56; Lacefield v. State, 34 Ark. 275, 36 Am. Rep. 8."

It is true that intent, in a case where specific intent is a necessary element of the offense, is a question of fact for the jury, to be determined from all the circumstances and beyond a reasonable doubt, but where the facts proven afford no reasonable ground for inference as to intent, it necessarily follows that the question should not be submitted to the jury.

But here it is our conclusion that a reversal of the case is not required, because assault was a necessary element of the charge of assault with intent to commit a felony, kidnapping. A lesser offense (a misdemeanor) within the larger. The court gave proper instructions to the jury covering the included offense of assault, and assault and battery, and a proper instruction covering the matter of intoxication as affecting intent, but did not give an instruction covering intent generally and defining "secretly confining", which omission would have constituted fundamental error had there been sufficient evidence to have the question of the major offense submitted.

It is said in 42 C.J.S., Indictments and Information, § 286, page 1308:

"Where the charge of a greater offense contains the essential elements of a minor offense, the jury may acquit accused of the greater charge and find him guilty of the lesser offense included therein. This rule applies in all cases in which the minor offense is necessarily an elemental part of the greater when proof of the greater necessarily establishes the lesser, or, as is sometimes stated, where the offenses are of the same generic class, and although they could not be charged together in the same count."

While there are factual differences, the cases of Ex parte Peoples, 69 Okla. Cr. 83, 100 P. 2d 295; and Lebo v. State, 40 Okla. Cr. 116, 267 P. 288, are analogous. The latter case involved a charge of assault with intent to rape. We there said:

"Where an accused is convicted of an assault with intent to commit rape, and the evidence is insufficient to show that accused committed an assault and battery upon the person of the prosecutrix with the intent to overcome her resistance and to accomplish an act of sexual intercourse, but is sufficient to show an assault and battery, the judgment will be modified to an assault and

battery, the punishment fixed at the maximum, and, as modified, the judgment affirmed."

Here the judgment is modified from an assault with intent to commit a felony, kidnapping, to an assault, and the punishment fixed at the maximum of a fine of $100 and thirty days in the county jail.

As so modified, the case is affirmed.

JONES and BRETT, JJ., concur.