Tommy G. LASTER, Appellant

v.

The STATE of Texas.

No. PD–1276–07.

Court of Criminal Appeals of Texas.

Jan. 14, 2009.

Kim Campbell, Fort Worth, for Appellant.

Kimberly Colliet Wesley, Assistant Criminal District Atty., Fort Worth, Jeffrey L. Van Horn, State's Atty., Austin, for State.

## OPINION

KEASLER, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, WOMACK, and HERVEY, JJ., joined.

Tommy G. Laster appealed his conviction, claiming that the evidence was legally and factually insufficient. When reviewing the legal sufficiency of the evidence, the Forth Worth Court of Appeals stated that circumstantial evidence of intent is reviewed less rigorously than other elements of an offense.[1] This statement is incorrect. We, however, uphold Laster's conviction because the evidence is legally and factually sufficient.

### I. Background

After buying eggs for their mother at a convenience store on January 30, 2005, B.T., who was eight, and her brother, who was ten, began to walk home. While walking on the sidewalk, B.T. pushed a bicycle, and her brother walked beside her. The children saw a man, carrying a closed umbrella, walking toward them. To allow the man to pass, the children leaned against a fence next to the sidewalk. Instead of passing by, the man grabbed B.T.'s arm.

---

1. *Laster v. State*, 229 S.W.3d 788, 791 (Tex. App.-Fort Worth 2007).

The man then put his arm around B.T.'s waist and tried to pull her away. B.T. let go of the bicycle and yelled for help. Her brother grabbed her hand, and a tug of war over B.T. ensued. The man abruptly let go of B.T. when a driver honked the car's horn. The man then continued to walk down the sidewalk toward the store. The children ran home and told their mother that a man tried to take B.T.

B.T.'s mother reported the incident to the police. Later that day, B.T.'s mother saw a man walking down the street. The man, Tommy G. Laster, looked like the man that B.T. had described to the police. B.T.'s mother called the police and continued to follow Laster. The police arrived and arrested Laster based, in part, on the children identifying him as the man who grabbed and pulled B.T. After the police arrested Laster, he gave a written statement describing what happened:

> While [the children] were coming toward me, the voices in my head started telling me that I would be better off dead. As I got closer to the kids and I was watching them, the voices in my head told me to grab the little girl. The voices were telling me to "Get her, get her." I grabbed her using my right arm around her waist. I saw her long hair and the side of her face. I also saw the little boy next to her. That is when I realized that I needed to let go of her because she was a little girl and I knew how that would look to the cars going by. I was thinking to myself, "Did I actually grab her in the broad daylight with all of this traffic[?] I must be nuts." She looked at me. She looked scared and wide eyed. I let her go and hurried my pace to get to the store. . . .

Laster was charged with injury to a child and attempted aggravated kidnapping. The jury convicted him of both counts, and the trial judge sentenced Laster to twenty years' confinement for injuring a child and forty years' confinement for attempting to kidnap B.T.

On appeal to the Forth Worth Court of Appeals, Laster challenged only his conviction for attempted aggravated kidnapping.[2] He alleged that the evidence was legally and factually insufficient to prove that he had the intent to abduct B.T.[3] To prove that Laster had the intent to abduct B.T., the State had to show that Laster specifically intended to secrete or hold B.T. "in a place where [s]he [was] not likely to be found; or us[ed] or threaten[ed] to use deadly force."[4] The court of appeals agreed with Laster that there was no evidence that he attempted to use deadly force.[5] But the court of appeals affirmed Laster's conviction, holding that the evidence was legally and factually sufficient to prove that Laster had the intent to hold or secrete B.T. in a place where she was unlikely to be found.[6] Deferring to the jury's finding, the court rejected Laster's argument that grabbing B.T. in a public place showed that he did not intend to take her anywhere.[7] Rather, the court held that the "very brazenness and public nature of [Laster's] actions" could lead a reasonable jury to infer that Laster did intend to take B.T.[8] The jury was also free

2. *Id.* at 791 n. 1.

3. *Id.* at 793.

4. Tex. Penal Code Ann. § 20.01(2) (Vernon 2003).

5. *Laster,* 229 S.W.3d at 793.

6. *Id.* at 793–95.

7. *Id.* at 793.

8. *Id.* at 794.

to reject Laster's argument that his confession showed his intent only to grab B.T.[9] In the court's view, the jury could have reasonably inferred that Laster tried to isolate B.T. from her brother and abandoned his plan only when he realized the risk of being caught.[10]

In dissent, Justice Dauphinot concluded that there was no evidence of Laster's intent to take B.T.[11] She said that there were other reasonable explanations for why Laster grabbed B.T.[12] For example, he wanted to steal her bicycle or sexually abuse her on the sidewalk.[13] Given these other explanations, Justice Dauphinot criticized the majority for holding that a reasonable factfinder could infer that Laster intended to hold or secrete B.T. in a place that she was unlikely to be found.

Laster filed a petition for discretionary review, contending that the court of appeals applied an incorrect standard of review by affording too much deference to the jury's fact determination when evaluating the circumstantial evidence of intent. Laster also asked us to adopt Justice Dauphinot's view that the evidence was legally and factually insufficient to support his conviction. We granted review and now affirm the court of appeals's judgment.

## II. Sufficiency Standards of Review

### A. Legal Sufficiency

The Due Process Clause to the United States Constitution requires that a criminal conviction be supported by a rational trier of fact's findings that the accused is guilty of every essential element of a crime beyond a reasonable doubt.[14] This due process guarantee is safeguarded when a court reviews the legal sufficiency of the evidence.[15] During such a review, an appellate court must not usurp the role of the factfinder.[16] Appellate courts are ill-equipped to weigh the evidence; unlike the factfinder—who can observe facial expressions and hear voice inflections firsthand—an appellate court is limited to the cold record.[17] Our role on appeal is restricted to guarding against the rare occurrence when a factfinder does not act rationally,[18] and we have final jurisdiction to review the legal sufficiency of the evidence.[19] When conducting a legal sufficiency review, a court must ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"—not whether "*it* believes that the evidence at the trial established guilt beyond a reasonable doubt."[20] In doing so, we assess all of the evidence "in the light most favorable to the prosecution."[21] We have said that this same stan-

9. *Id.* at 793.

10. *Id.*

11. *Id.* at 795 (Dauphinot, J., dissenting).

12. *Id.* (Dauphinot, J., dissenting).

13. *Id.* (Dauphinot, J., dissenting).

14. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

15. *Id.* at 319, 99 S.Ct. 2781.

16. *Moreno v. State*, 755 S.W.2d 866, 867 (1988).

17. *Id.*

18. *Jackson*, 443 U.S. at 317, 99 S.Ct. 2781.

19. *Combs v. State*, 643 S.W.2d 709, 717 (Tex. Crim.App.1982), *overruled on other grounds by Butler v. State*, 769 S.W.2d 234 (Tex.Crim. App.1989).

20. *Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781 (emphasis in original).

21. *Id.* at 319, 99 S.Ct. 2781.

dard applies equally to circumstantial and direct evidence.[22] After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element.[23]

## B. Factual Sufficiency

 A verdict must also be supported by factually sufficient evidence. But unlike a legal sufficiency review, which is a federal due process requirement, a factual sufficiency review is a creature of state law.[24] On direct appeal, a court must begin its factual sufficiency review with the assumption that the evidence is legally sufficient under *Jackson*.[25] Evidence that is legally sufficient, however, can be deemed factually insufficient in two ways: (1) the evidence supporting the conviction is "too weak" to support the factfinder's verdict, or (2) considering conflicting evidence, the factfinder's verdict is "against the great weight and preponderance of the evidence."[26] When a court of appeals conducts a factual sufficiency review, it must defer to the jury's findings.[27] We have set out three "basic ground rules" implementing this standard.[28] First, the court of appeals must consider all of the evidence in a neutral light,[29] as opposed to in a light most favorable to the verdict.[30] Second, the court of appeals may only find the evidence factually insufficient when necessary to "prevent manifest injustice."[31] Although the verdict is afforded less deference during a factual sufficiency review, the court of appeals is not free to override the verdict simply because it disagrees with it.[32] Third, the court of appeals must explain why the evidence is too weak to support the verdict or why the conflicting evidence greatly weighs against the verdict.[33] This requirement serves two related purposes. First, it supports the court of appeals's judgment that a manifest injustice has occurred.[34] And second, it assists us in ensuring that the standard of review was properly applied.[35]

 Unlike our jurisdiction over legal sufficiency decisions, our jurisdiction over the court of appeals's factual sufficiency decisions is limited.[36] The Factual Conclusivity Clause gives final appellate jurisdiction to the court of appeals on questions of fact brought before the court.[37] We review the court of appeals's factual sufficiency analysis to ensure that the court applied the correct legal standard and considered all of the relevant

---

22. *Burden v. State*, 55 S.W.3d 608, 613 (Tex. Crim.App.2001).

23. *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex. Crim.App.1992).

24. *Watson v. State*, 204 S.W.3d 404, 406 (Tex. Crim.App.2006).

25. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim.App.1996) (citing *Clewis v. State*, 922 S.W.2d 126, 134 (Tex.Crim.App.1996)).

26. *Watson*, 204 S.W.3d at 414–15.

27. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim.App.1997).

28. *Watson*, 204 S.W.3d at 414.

29. *Id.*

30. *Id.*

31. *Cain*, 958 S.W.2d at 407.

32. *Id.*

33. *Watson*, 204 S.W.3d at 414.

34. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex.Crim.App.2008).

35. *Id.*

36. *Cain*, 958 S.W.2d at 408.

37. Tex. Const. art. V, § 6.

evidence.[38] We do not conduct a de novo factual sufficiency review.[39] If we determine that the court of appeals applied the wrong standard or misapplied the correct standard, the case must be remanded to the court of appeals to conduct a proper factual sufficiency review.[40]

With the proper roles of the factfinder, the court of appeals, and our Court put into perspective, we now evaluate the court of appeals's legal and factual sufficiency analyses.

### III. Analysis

■■■ Laster claims that the court of appeals erred by finding that the evidence was legally and factually sufficient to show that he intended to hold or secrete B.T. in a place where she was not likely to be found. In doing so, Laster contends that the court of appeals incorrectly applied a less-rigorous standard when reviewing the circumstantial evidence of intent. Laster appears to argue that the court of appeals's misstatement of law affected both the court's factual and legal sufficiency reviews. His argument, however, is not entirely clear because, like the court of appeals, Laster combines his factual and legal sufficiency discussions, thereby discounting any variance between the two standards. We have stated "that determining the legal and factual sufficiency of evidence requires the implementation of separate and distinct standards."[41] Courts and litigants should not combine their legal and factual sufficiency analyses. So while we recognize that any analyses of the facts in a given case will naturally overlap, a separate review under the applicable standard is necessary to ensure that the law was properly applied.

After reading the court of appeals's opinion, we determine that Laster is partially correct. The court of appeals applied the wrong standard only when reviewing the legal sufficiency of the evidence. We, however, affirm the court of appeal's judgment because the evidence is legally sufficient and the court of appeals applied the correct factual sufficiency standard.

### A. Standard of Review

Laster criticizes the court of appeals for applying an unduly lenient standard when reviewing the circumstantial evidence of intent. Quoting our decision in *Margraves v. State*,[42] the court of appeals stated that "[c]ircumstantial evidence of a defendant's guilty knowledge is not 'required to meet the same rigorous criteria for sufficiency as circumstantial proof of other offensive elements.' "[43] Laster contends that this statement represents a holdover from the obsolete jury instruction on circumstantial evidence and is improper.

■■■ On this point, we agree with Laster's reading of the court of appeals's opinion and disavow any notion that circumstantial evidence of intent is reviewed less stringently than any other type of evidence. The quoted language from *Margraves* was taken out of context and is not part of our modern sufficiency review. Circumstantial evidence of intent must be

38. *Lancon*, 253 S.W.3d at 704.

39. *Id.*

40. *Cain*, 958 S.W.2d at 408.

41. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim. App.2000).

42. 34 S.W.3d 912 (Tex.Crim.App.2000).

43. *Laster*, 229 S.W.3d at 791 (quoting *Margraves*, 34 S.W.3d at 919).

reviewed with the same scrutiny as other elements of an offense.

The passage in *Margraves,* cited by the court of appeals, was first articulated in our *Brown v. State* decision.[44] The issue in *Brown* was whether the affirmative link test, used to determine whether an accused intended to possess drugs, still applied after the reasonable hypothesis test was abolished.[45] The reasonable hypothesis test developed out of our suspicion of convictions based wholly on circumstantial evidence.[46] The test was implemented at trial by instructing the jury that circumstantial evidence must "exclude, to a moral certainty, every other reasonable hypothesis except the defendant's guilt."[47] The same standard carried over on appeal to test the sufficiency of circumstantial evidence.[48] But once we recognized that circumstantial evidence was as valuable as direct evidence, we abandoned the reasonable hypothesis test.[49]

To explain why the affirmative link test survived the termination of the reasonable hypothesis test, we pointed to opinions applying the affirmative link test but not mentioning the reasonable hypothesis test.[50] We then downplayed the precedential value of drug cases mentioning the reasonable hypothesis test.[51] We stated that, although the cases mentioned the reasonable hypothesis test, the rhetorical recital of the standard "should not, however, be taken to mean that circumstantial evidence of a defendant's guilty knowledge was required to meet the same rigorous criteria for sufficiency as circumstantial proof of other offensive elements" because the test was never applied.[52] We also noted that we rarely applied the reasonable hypothesis test to circumstantial evidence of intent in any type of case.[53] While circumstantial evidence of most elements warranted the reasonable hypothesis test, the test was rarely applied to circumstantial evidence of intent because it was unworkable in that context.[54] Excluding every reasonable hypothesis of what the accused was thinking was close to impossible—only the accused can absolutely know his or her intent.[55] Because other reasonable, noncriminal explanations for a defendant's conduct always exist, a true application of the reasonable hypothesis analysis would lead to an acquittal in most cases.[56]

The court of appeals, in this case, and this Court in *Margraves* took the passage in *Brown* to mean that circumstantial evidence of intent is to be reviewed less stringently than circumstantial evidence of other elements. But any distinction between circumstantial evidence of intent and other elements was rendered obsolete when the reasonable hypothesis test was abandoned.

---

**44.** *911 S.W.2d 744, 747 (Tex.Crim.App.1995).*

**45.** *Id.* at 745.

**46.** *Hankins v. State,* 646 S.W.2d 191, 207 (Tex.Crim.App.1983) (Onion, P.J., dissenting).

**47.** *Geesa v. State,* 820 S.W.2d 154, 156 n. 2 (Tex.Crim.App.1991), *overruled on other grounds by Paulson v. State,* 28 S.W.3d 570 (Tex.Crim.App.2000).

**48.** *Girard v. State,* 631 S.W.2d 162, 163 (Tex. Crim.App.1982).

**49.** *Geesa,* 820 S.W.2d at 155.

**50.** *Brown,* 911 S.W.2d at 746–47.

**51.** *Id.* at 746.

**52.** *Id.* at 747.

**53.** *Id.*

**54.** *Matson v. State,* 819 S.W.2d 839, 845–46 (Tex.Crim.App.1991).

**55.** *Id.* at 846.

**56.** *Id.*

Courts and juries no longer face the difficult task of excluding every reasonable hypothesis other than the defendant's guilt. Under the current standard of review, there is no reason to treat circumstantial evidence of an accused's mental state any differently than circumstantial evidence of other elements. Just as circumstantial evidence is reviewed under the same standard as direct evidence, circumstantial evidence of intent is reviewed under the same standard as circumstantial evidence of other elements. In a sufficiency analysis, all of the evidence admitted at trial to support the conviction should be reviewed equally on appeal.

## B. Applicable Law

■ To prove that Laster committed the offense of attempted aggravated kidnapping, the State was required to present sufficient evidence that Laster did "an act amounting to more than mere preparation" with the specific intent to commit aggravated kidnapping.[57] A person commits the offense of aggravated kidnapping if "he intentionally or knowingly abducts another person" and commits an aggravating element.[58] Thus, two elements are required to prove aggravated kidnapping: (1) intent or knowledge to abduct, and (2) commission of an aggravating element.

■ " 'Abduct' means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place

where he is not likely to be found; or (B) using or threatening to use deadly force."[59] "Abduct" then includes two elements.[60] First, the defendant must have restrained another, which is the *actus reus* requirement.[61] Second, the defendant must have had the specific intent to prevent liberation, which is the *mens rea* requirement.[62] Secreting or holding another where he or she is unlikely to be found is part of the *mens rea* requirement of the offense—not the *actus reus*.[63] This is an important distinction because the State is not required to prove that the defendant actually secreted or held another.[64] Instead the State must prove that the defendant restrained another with the specific intent to prevent liberation by secreting or holding the person.[65] The offense of kidnapping is legally completed when the defendant, at any time during the restraint, forms the intent to prevent liberation by secreting or holding another in a place unlikely to be found.[66]

A kidnapping is aggravated when a defendant intentionally or knowingly abducts another: (1) with the specific intent to accomplish one of six purposes or (2) "uses or exhibits a deadly weapon during the commission of the offense."[67] The six purposes are as follows:

(1) hold him for ransom or reward;

(2) use him as a shield or hostage;

57. Tex. Penal Code Ann. § 15.01 (Vernon 1994).

58. Tex. Penal Code Ann. § 20.04 (Vernon 1995).

59. Tex. Penal Code Ann. § 20.01(2) (Vernon 2003).

60. *Brimage v. State*, 918 S.W.2d 466, 475–76 (Tex.Crim.App.1994).

61. *Id.* at 476.

62. *Id.*

63. *Id.* at 475.

64. *Id.* at 476.

65. *Id.*

66. *Id.* at 475.

67. Tex. Penal Code Ann. § 20.04(a)-(b).

(3) facilitate the commission of a felony or the flight after the attempt or commission of a felony;

(4) inflict bodily injury on him or violate or abuse him sexually;

(5) terrorize him or a third person; or

(6) interfere with the performance of any governmental or political function.[68]

Here, the State was required to prove that Laster committed an act beyond mere preparation with the intent to secrete or hold B.T. and commit an aggravating element—not that Laster could, or did, actually accomplish this purpose.

## C. Legal Sufficiency Review

■ Laster argues that the evidence presented at trial was legally insufficient to support the jury's finding that he intended to hold or secrete B.T. in a place where she was unlikely to be found. We disagree.

In support of his conclusion, Laster points to three circumstances that he contends show that he had no such intent. We will consider each of these arguments in turn.

First, Laster suggests that the State did not prove that he intended to take B.T. because he grabbed her in front of possible eyewitnesses. But the State did not have to prove that he actually accomplished his purpose or even that he could have accomplished his purpose.[69] The State only had to prove that he had such a purpose.[70] Further, as the court of appeals noted, the jury was not precluded from inferring that

Laster intended to secrete or hold B.T. in a place where she was unlikely to be found simply because he restrained her in public.[71] We have recognized that a rational factfinder can infer such an intent when a defendant isolates a person from anyone who might be of assistance.[72] B.T. testified that Laster grabbed her around the waist then tried to pull her away. Corroborating B.T.'s testimony, her brother stated that when Laster tried to pull B.T. away, he grabbed her arm and pulled back. The jury could reasonably infer from this testimony that by pulling B.T. away from her brother, the only person available to help her, Laster intended to hold or secrete B.T. in a place where she was unlikely to be found.

Second, relying on Justice Dauphinot's dissenting opinion, Laster argues that there are other reasonable explanations for why he grabbed B.T. For example, he wanted to steal her bicycle or sexually abuse her. Without proof that one explanation was more reasonable than another, Laster contends, relying on Justice Dauphinot's reasoning, that the evidence was insufficient. But this reasoning invades the factfinder's role. It is up to the factfinder to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[73] By focusing on other reasonable alternatives to explain why Laster grabbed B.T., Justice Dauphinot improperly applied the outdated reasonable hypothesis construct, thereby placing herself in the "posture of a 'thirteenth

---

**68.** Tex. Penal Code Ann. § 20.04(a).

**69.** *Brimage*, 918 S.W.2d at 476.

**70.** *Id.*

**71.** *Laster*, 229 S.W.3d at 793; *see Megas v. State*, 68 S.W.3d 234, 241 (Tex.App.-Houston [1st Dist.] 2002, pet ref'd).

**72.** *Fann v. State*, 696 S.W.2d 575, 576 (Tex. Crim.App.1985); *Megas*, 68 S.W.3d at 240.

**73.** *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781.

juror.' " [74] As long as the verdict is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable. As stated above, the evidence showed that Laster grabbed and then pulled B.T. toward him. Laster continued to pull B.T. after her brother came to her aid. It was not until a driver honked the car's horn that Laster released B.T. A factfinder could reasonably infer from this evidence that Laster was planning to do more than just steal her bike or molest her.

Finally, Laster argues that the evidence showed that he intended only to grab B.T. because his confession did not imply otherwise and he let go of her within a matter of seconds. Contrary to Laster's claim that there is only one interpretation of his confession, there is another rational interpretation. Laster not only said that the voices in his head were telling him to "grab the little girl," but they were also telling him to " '[g]et her, get her.' " He confessed to restraining B.T. until he "saw the little boy next to her" and realized that he "needed to let go of her because she was a little girl and [he] knew how that would look to the cars going by." Even if this evidence was believed, a rational factfinder could infer that Laster formed the intent to take B.T. when he grabbed her and abandoned his plan when he realized that other people were witnessing his actions. Indeed, the evidence presented at trial showed that Laster released B.T. when a driver honked the car's horn. Rather than concluding that Laster released B.T. because he just wanted to grab her, viewed in the light most favorable to the

verdict, the evidence showed that Laster formed the intent to take B.T. when he grabbed her and let go because he feared that he may be caught.[75]

In dissent, Judge Cochran claims that the evidence is legally insufficient to show Laster's intent to (1) hold or secrete B.T. in a place where she was unlikely to be found, or (2) commit an aggravating element. We will address both her contentions.

Like Justice Dauphinot, Judge Cochran claims that she can only speculate about what Laster intended when he grabbed B.T. She lists scenarios that Laster possibly could have intended and concludes that, because the evidence does not support those scenarios, it cannot support the jury's verdict. In doing so, she discards her robe, this time to assume the role of a super-juror,[76] ready and willing to nullify the unanimous verdict of twelve individuals. However, as an appellate court, we are not permitted to supplant our judgment for that of a rational factfinder—no matter how tempting. So while Judge Cochran purports to view the evidence in the light most favorable to the prosecution, she ignores the evidence that supports the jury's verdict that Laster intended to hold or secrete B.T. in a place where she was unlikely to be found—Laster did not simply grab at B.T.; he pulled her away.

 Next, although Laster does not claim that the evidence supporting the aggravating element is insufficient, Judge Cochran claims that it is. But the jury could reasonably infer from Laster's actions that he intended to inflict bodily inju-

---

**74.** *See Geesa*, 820 S.W.2d at 159.

**75.** *Cf. Brown v. State*, 98 S.W.3d 180, 188 (Tex.Crim.App.2003) (explaining that a defendant does not "voluntarily release[ ] the victim in a safe place" in the context of Section 20.04(d) if the victim is rescued or escapes).

**76.** *See cf. State v. Colyandro*, 233 S.W.3d 870, 887–96 (Tex.Crim.App.2007) (Cochran, J., dissenting).

ry on B.T. Bodily injury is broadly defined in the Penal Code as "physical pain, illness, or any impairment of physical conduction." [77] This definition encompasses even relatively minor physical contact if it constitutes more than offensive touching.[78] Direct evidence that a victim suffered pain is sufficient to show bodily injury.[79] B.T. testified that she felt pain when Laster grabbed her around the waist and pulled her. Because "[o]ne's acts are generally reliable circumstantial evidence of one's intent," [80] the jury could reasonably infer that Laster intended to do exactly what he did—to inflict bodily injury on B.T.

Given the evidence presented at trial, a rational trier of fact, charged with discerning Laster's intent from the surrounding circumstances, could have found beyond a reasonable doubt that Laster intended to inflict bodily injury on B.T. and hold or secrete her in a place she was unlikely to be found. Affording appropriate deference to the jury's verdict, we therefore hold that the evidence supporting Laster's conviction is legally sufficient.

### D. Factual Sufficiency Review

 Laster also asks us to find that the evidence is factually insufficient. As stated above, we are not, however, constitutionally permitted to conduct a de novo review of a court of appeals's factual sufficiency decision.[81] Our jurisdiction is limited to reviewing whether the court of appeals applied the correct rule of law.[82] We find that the court of appeals applied the correct standard of review and considered all of the relevant evidence before finding that it was factually sufficient.

The court of appeals's analysis followed all of the ground rules that are necessary to ensure that the jury's findings are respected. The court of appeals considered all of the relevant evidence, opposing and supporting the verdict, in a neutral light. The court discussed the evidence that Laster argued opposed the verdict: he was on foot; he never used a weapon; he never made any threats; he grabbed B.T. in public; he let go of B.T. quickly; he continued walking to the store; and, he told police that he grabbed B.T. only because of the voices in his head. The court then discussed the evidence supporting the verdict: Laster was a total stranger to B.T.; Laster scared and surprised both children when he grabbed B.T.; Laster tried to pull B.T. from her brother; and, Laster did not let B.T. go until a car drove by.

The court explained why, despite Laster's claim, the evidence was factually sufficient. Laster did not present any evidence at trial, so the only question that the court of appeals faced was whether the State's evidence was so weak that the jury's determination was manifestly unjust.[83] The State's evidence was largely based on the B.T.'s and her brother's credibility. The court of appeals properly deferred to the jury's determination that their testimony was credible. Testimony that Laster tried to pull B.T. away from her brother and let go only when a car drove by was enough to support the jury's finding that Laster attempted to commit

**77.** Tex. Penal Code Ann. § 1.07(a)(8) (Vernon 2003).

**78.** *Lane v. State*, 763 S.W.2d 785, 786 (Tex. Crim.App.1989).

**79.** *Lewis v. State*, 530 S.W.2d 117, 118 (Tex. Crim.App.1975).

**80.** *Rodriguez v. State*, 646 S.W.2d 524, 527 (Tex.App.-Houston [1st Dist.] 1982, no pet.).

**81.** Tex. Const. art. V, § 6.

**82.** *Lancon*, 253 S.W.3d at 704.

**83.** *See Johnson*, 23 S.W.3d at 11.

aggravated kidnapping. The court explained that the jury was free to reject Laster's theory of the State's evidence and, instead, believe the children's testimony. Because the jury in this case was the final judge of witnesses' credibility, the court of appeals was correct in upholding the jury's verdict. We find no error in the standard used by the court of appeals or its application.

## IV. Conclusion

We hold that the evidence was legally sufficient to support Laster's conviction for attempted aggravated kidnapping. We also hold that the court of appeals properly applied the law when it found that the evidence presented at trial was factually sufficient. We, therefore, affirm the court of appeals's judgment.

COCHRAN, J., filed a dissenting opinion in which PRICE, JOHNSON, and HOLCOMB, JJ., joined.

## *OPINION*

COCHRAN, J., filed a dissenting opinion in which PRICE, JOHNSON and HOLCOMB, JJ., joined.

I respectfully dissent. I do not agree with the majority of the court of appeals [1] that a rational trier of fact could conclude from the evidence in this case, beyond a reasonable doubt, that appellant (1) had a specific intent to hold or secrete eight-year-old Beatrice in a place where she was unlikely to be found, much less (2) had a specific intent to perform one of the other

acts—such as holding her for ransom, using her as a shield, inflicting bodily injury on her or abusing her sexually—that is required for aggravated kidnapping. This is not an attempted kidnapping case. And it is certainly not an attempted aggravated kidnapping case. This is an unlawful restraint case.[2]

## I.

A person commits unlawful restraint "if he intentionally or knowingly restrains another person." [3] Restrain means "to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." [4] Restraint is "without consent" if "the victim is a child who is less than 14 years of age" and "the parent, guardian, or person or institution acting in loco parentis has not acquiesced in the movement or confinement." [5]

A person commits kidnapping if he "intentionally or knowingly abducts another person." [6] Abduct means "to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." [7] As noted by the majority, the offense of kidnapping is legally completed when the defendant, at any time during the restraint, forms the intent to prevent liberation by secreting or holding another in a place unlikely to be found.

1. *Laster v. State,* 229 S.W.3d 788 (Tex.App.-Fort Worth 2007).

2. Appellant was also convicted for injury to a child and sentenced to twenty years imprisonment for that offense. Appellant did not appeal that conviction.

3. TEX. PENAL CODE § 20.02(a).

4. TEX. PENAL CODE § 20.01(1).

5. TEX. PENAL CODE § 20.01(1)(B)(i).

6. TEX. PENAL CODE § 20.03(a).

7. TEX. PENAL CODE § 20.01(2).

A person commits aggravated kidnapping if he abducts another person with a further or second specific intent to

(1) hold him for ransom or reward;

(2) use him as a shield or hostage;

(3) facilitate the commission of a felony or the flight after the attempt or commission of a felony;

(4) inflict bodily injury on him or violate or abuse him sexually;

(5) terrorize him or a third person; or

(6) interfere with the performance of any governmental or political function.[8]

A person commits the crime of attempted aggravated kidnapping only if, acting with the specific intent both to abduct another person *and* to hold her for one of the six purposes set out above, he does an act—such as grabbing a child—that amounts to more than mere preparation and that tends, but fails, to effect the commission of the aggravated kidnapping.[9]

But not every grabbing or illegal restraint of a stranger—child or adult—evinces an intent to kidnap.[10] And certainly not every grabbing of a stranger evinces an intent to hold her for ransom, use her as a shield, facilitate the commission of some felony, inflict bodily injury, sexually abuse her or commit one of the other enumerated acts as is required for attempted aggravated kidnapping.[11] Because criminal attempt is an inchoate crime, one that has not actually occurred, the defendant's acts, words, and the attendant circumstances of the attempt should be "strongly corroborative of the actor's criminal purpose."[12] Inchoate

---

**8.** Tex. Penal Code § 20.04(a).

**9.** Tex Penal Code § 15.01(a).

**10.** *See Vandiver v. State,* 97 Okla.Crim. 217, 261 P.2d 617, 624 (App.1953) (overruled on other grounds) ("Would the mere fact that the defendant took Mrs. Bridges in his arms and was therefore guilty of assault, force the conclusion *ipso facto* that he was going to kidnap her, (which means to take secretly, confine her against her will) any more than that he was going to murder her there on the spot, or take her for a wild ride in his car, or just sit with her in the car? There was no evidence direct or circumstantial of what the intentions of the defendant were beyond holding Mrs. Bridges in his arms, other than his statement that he asked her to go get a bottle of beer. There are many possible ideas that may have been in his mind. But more than speculation is required. We have sought in vain for evidence to support the judgment, but there is no evidence or circumstances to support the judgment or the conclusion or guess advanced by the Attorney General, which we have heretofore quoted. The law will not presume an intention beyond that realized by the act.").

**11.** "The word 'attempt' means to try; it implies an effort to bring about a desired result. Hence an attempt to commit any crime re-

quires a specific intent to commit that particular offense. If other elements of an attempt are established 'intent is the crucial question.'" Rollin M. Perkins & Ronald N. Boyce, Criminal Law 637 (3d ed.1982) (footnotes omitted). See also Wayne R. LaFave, Substantive Criminal Law § 11.3(a) at 213 & n. 25 (2nd ed. 2003) ("It is not enough to show that the defendant intended to do some unspecified criminal act.") (citing *In re Smith*, 3 Cal.3d 192, 90 Cal.Rptr. 1, 474 P.2nd 969 (1970), with a parenthetical stating "where defendant convicted of attempted kidnapping on evidence that he grabbed woman, brandished screwdriver, and said they were going in her car, which he attempted to open, effective counsel might well have argued that this did not show intent to kidnap as opposed to intent to rape or to steal").

**12.** Model Penal Code § 5.01(2). Section (2) states that "Conduct shall not be held to constitute a substantial step ... unless it is strongly corroborative of the actor's criminal purpose. Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (a) lying in wait, searching for or following the contemplated victim of the crime; (b) enticing or seeking to entice the contemplated victim of the crime to go to the place contem-

crimes balance the goals of law enforcement with the liberty rights of citizens by ensuring that law enforcement may intervene to prevent crime, but only after the actor has formed a specific criminal purpose and has engaged in adequate conduct in furtherance of that specific intent to demonstrate that, if left to his own devices, the attempted crime would likely occur.[13]

Some felonies cannot be committed without some restraint of the victim. This Court has stated that the "Legislature did not intend for every crime which involves a victim whose liberty has been interfered with to turn into a kidnapping. It is up to the jury to distinguish between those situations in which a substantial interference with the victim's liberty has taken place and those situations in which a slight interference has taken place."[14] Courts in other jurisdictions have repeatedly recognized that restraint simply incident to other crimes does not support a separate conviction for kidnapping or aggravated kidnap-

plated for its commission; (c) reconnoitering the place contemplated for the commission of the crime; (d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (e) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances; (f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (g) soliciting an innocent agent to engage in conduct constituting an element of the crime."

LaFave notes that along with the Model Penal Code approach—courts and legislatures have adopted 1) the "proximity approach," (was the act sufficiently proximate to the intended crime? *i.e.*, a last proximate act, an indispensable act, or a physically proximate act?); 2) the "probable desistance approach," (was the act one which in the ordinary course of events would result in the commission of the target crime except for the intervention of some extraneous factor? *i.e.*, an act beyond which a normal citizen would stop) and 3) the "equivocality approach" or "res ipsa loquitur test" (was the act of such a nature that it is itself evidence of the criminal intent with which it is done, *i.e.*, an act that bears criminal intent on its face, an act that can have no other purpose than the commission of that specific crime). LaFave, Substantive Criminal Law § 11.4 at 224–25.

13. See ALI, Model Penal Code Commentaries § 5.01 at 294 (1985) (laws covering inchoate crimes 1) provide a legal basis for intervention of law enforcement to prevent consummation of a crime; 2) subject actors generally disposed towards criminal activity to the corrective process that law provides; 3) capture actors who fail to commit the substantive offense due to a fortuity). *See also* LaFave, Substantive Criminal Law § 11.4 at 208–10 ("the law of attempts exists because there is just as much need to stop, deter and reform a person who has unsuccessfully attempted or is attempting to commit a crime that one who has already committed such an offense." Otherwise, "exculpation of those who fail due to a fortuity 'would involve inequality of treatment that would shock the common sense of justice.' ").

14. *Hines v. State,* 75 S.W.3d 444, 448 (Tex. Crim.App.2002) (nothing in the kidnapping statute indicates that the Legislature intended "to bar the prosecution of a kidnapping that is part and parcel of another offense" so long as there is a restriction of a person's movements so as to interfere *substantially* with the person's liberty). *Herrin v. State,* 125 S.W.3d 436, 440–441 (Tex.Crim.App.2002) (kidnapping, or attempted kidnapping not proven when defendant "did not shoot to merely disable or harm Wayne so that he could then abduct him, but shot him at close range in the vital organs in an obvious effort to kill him. In light of appellant's intent to murder Wayne, appellant's moving of Wayne's body after the shooting did not amount to evidence that Wayne was in the course of a kidnapping when the murder took place.") (citing *Urbano v. State,* 837 S.W.2d 114, 116 (Tex.Crim.App. 1992) ("proof beyond a reasonable doubt" carries considerable weight; it means proof to a high degree of certainty)).

ping.[15]

## II.

·In this case it is undisputed that, at 10:00 a.m., on a Sunday morning, on the sidewalk of a busy street in Fort Worth, appellant grabbed at eight-year-old Beatrice, who, with her ten-year-old brother Raymond, was on the way home after a trip to the store. Raymond had ridden his bike to the store, with Beatrice standing on the back wheel pegs; Beatrice was either riding or walking the bike on their way home.[16] Appellant grabbed her with one hand around the waist, while not himself letting go of the big, red-and-white golf umbrella he was carrying. She screamed, her brother pulled her back toward him and gave appellant a shove, and appellant let her go a few seconds later when a car drove by and its driver honked his horn. Raymond grabbed the bike, and they both ran home. Appellant walked down the street toward the store, and then he stayed in the neighborhood all day, as if nothing had occurred.[17] Beatrice and Raymond testified that they thought appellant was trying to take Beatrice.[18] Appellant later told the police that voices in his head "started telling me that I would be better off dead." Then the voices told him to "grab the little girl." [19] Appellant

15. *See State v. Salamon*, 287 Conn. 509, 949 A.2d 1092, 1119–20 (2008) ("[A] considerable majority of state courts have followed the lead of New York and California in concluding that the crime of kidnapping does not include conduct involving a restraint that is merely incidental to the commission of some other crime against the victim.... Although these cases involve varying statutory language and analyses, they share a common theme, namely, that it is unlikely that the legislature intended to expose an accused to a kidnapping conviction, and the severe sanctions accompanying such a conviction, when the restraint involved is merely incidental to the commission of a separate, underlying crime. Indeed, this majority view regarding the construction of statutes delineating the crime of kidnapping rightly has been characterized as the 'modern' approach.") (citing cases from numerous jurisdictions).

16. Both children made statements that Beatrice was riding the bike, and that appellant almost knocked her off of it. But then they testified that Beatrice was walking the bike, and that appellant grabbed her, causing her to let go of the bike which then fell against a fence. Either way, the bike never hit the ground, and the children completed their trip home with the bike.

17. In his statement, appellant said that his sister had dropped him off at the Whataburger on East Lancaster Street. "I have her drop me off there every Saturday and Sunday so I can walk to the store and buy cigarettes or anything else I need before I walk to my brother's house. My brother, Samuel John Laster, lives in some apartments on Beach Street by Vicker." Appellant's sister testified at the punishment stage that appellant stayed in his room at her home five days a week, but that "I physically take him every Saturday and Sunday for the past three or four years, I drop him off at Whataburger on Lancaster, nonstop, unless it gets snow out on the ground and he just—it's just way too cold for him, this is nonstop I do this." "He stays until 3:00, approximately." She said that appellant was "on and off" his medicine. Taking that medicine is a prerequisite to appellant being allowed to live with her, but shortly before this incident, appellant quit taking it.

18. Raymond testified that appellant grabbed Beatrice, then, when the car honked, "he just immediately let go." Raymond was upset and crying because "he could have kidnapped her." Beatrice testified that appellant grabbed her and hurt her, that this was "offensive" to her and scared her, and that she thought he was going to take her. Both children testified that he did not take her anywhere or say anything.

19. The jury was told during opening statements that appellant "has a 40-year history of mental illness going back to the 1960s." Appellant filed a notice of the insanity defense, but apparently abandoned this defense during trial. Although the jury did not hear any evidence of appellant's mental illness during the guilt stage, it was admitted during the

had a crack cocaine pipe in his pocket when he was arrested, and the arresting officer thought he was acting "strange," possibly due "to him inducing an illegal narcotic."

Even with fully crediting the testimony of Beatrice and her brother, who were understandably terrified by their encounter with this most peculiar stranger, and discrediting appellant's version, I am nevertheless left with only speculation about what appellant's actual intentions were. Maybe they were nefarious; certainly the children believed that they were. Maybe he intended to secret or hold Beatrice in a place where she would not likely to be found just for "kicks" or because "the voices" told him to. Or maybe (as the jury here found) he intended to secret or hold her in such a place with a second, "aggravated intent," to hold her for the purpose

of ransom, or use as a hostage, or to facilitate the commission of a felony such as assault, sexual assault or terrorize her or her brother or mother.[20] Maybe he intended, as the dissent in the court of appeals noted, "to fondle her on the scene, to rape her on the scene, or to steal her bicycle."[21] None of these acts required an intent to abduct Beatrice. Maybe appellant's intentions were not nefarious. Maybe he wanted to put Beatrice on his shoulders or simply grab her and move her out of his way. Maybe he simply intended to follow "the voices" in his head, whatever they told him. But evidence of his intent to do any one of these things is lacking. What we do know is that he intentionally "restrained" Beatrice by grabbing her around the waist, albeit only for a few seconds.[22] And that restraint was, as a matter of law, without consent because

punishment hearing before the judge. Various mental health exhibits contained diagnoses of schizophrenia and reports of "hearing voices" dating back several years before this offense. These exhibits also noted appellant's rough appearance, his poor hygiene, and bad grooming. These records, dating back to 1969, included some documents from state hospitals to which appellant had been admitted when he was a child. His sister testified at punishment that appellant was on Social Security disability for several reasons: "Schizophrenic, manic depressant, can hardly hear, back problems, and I can't think of the fifth one." The only evidence contained in the record suggesting that appellant was interested in young girls was a conclusory hearsay report from Big Spring State Hospital, made when appellant was 14 years old, that said he had "a history of compulsive aggressive sexual acting out toward girls his own age and younger."

20. Strangely, appellant did not specifically challenge the sufficiency of evidence to prove this second, aggravated, intent on appeal, but it is, nonetheless, a required element for conviction.

21. *Laster,* 229 S.W.3d at 795 (Dauphinot, J., dissenting).

22. The most famous historical test for assessing the sufficiency of evidence to establish an attempt is the so-called "stop the film" test:

> If the example may be permitted, it is as though a cinematograph film, which has so far depicted merely the accused person's acts without stating what was his intention, had been suddenly stopped, and the audience were asked to say to what end those acts were directed. If there is only one reasonable answer to this question then the accused has done what amounts to an "attempt" to attain that end. If there is more than one reasonably possible answer, then the accused has not yet done enough.

J.W.C. Turner, *Attempts to Commit Crimes,* 5 Cambridge L.J. 120, 237–38 (1934); *see Hamiel v. State,* 92 Wis.2d 656, 285 N.W.2d 639, 645 (1979) (quoting Turner and stating that "in the crime of attempt, it is primarily the acts of the accused which provide evidence of the requisite mental intent. The acts of the accused committed in furtherance of the intended substantive crime '... must not be so few or of such an equivocal nature as to render doubtful the existence of the requisite criminal intent.' ").

Beatrice was less than fourteen years of age and her mother, who was waiting at home to make pancakes for her children, had not "acquiesced in the movement or confinement." [23]

In this case, assuming appellant had the intent to commit rape or some other felony, it would be up the jury to distinguish between whether a substantial interference with the victim's liberty was intended, or just a slight interference. Here, the jury could only speculate which, and, of course, there is no evidence of intent to commit such a felony in the first place.[24]

The majority points to *Fann v. State*,[25] and *Megas v. State*[26] as cases in which courts have held that a rational factfinder may infer an intent to secret or hold a person in a place where that person is unlikely to be found when a defendant isolates a person from anyone who might be of assistance. Indeed, that is true, but in those cases, the defendant had actually performed the act of isolating the victim from others. In *Fann,* the evidence showed

> that the victim of the kidnapping, a sixteen month old infant, along with her mother, was abducted sometime after 9:00 p.m. while visiting the grave of a deceased brother. They were forcibly driven away from the cemetery and around other parts of the city. The evidence reveals a constantly shifting path throughout the City of Irving. The victims were taken some distance from the area in which they might reasonably have been found and were kept isolated from anyone who might have been of assistance. They were later returned to the cemetery by appellant.[27]

Faced with that evidence, we held "that this forcible removal [of the victims]

---

**23.** *See* Tex. Penal Code § 20.02(a).

**24.** *See e.g., Green v. State,* 67 Miss. 356, 7 So. 326 (1890). In that case, the syllabus states,

> The appellant has been convicted of assault with intent to commit rape. The prosecutrix testified that she was riding in the daytime alone and on horse-back along the public road, about two miles from the town of Hazlehurst, when reaching a place where the public road crosses the railroad, she noticed a negro man standing on the crossing. Hearing a train approaching, she stopped and turned the horse's head towards the man, thinking, as she says, that he could assist her if the train frightened her horse. After riding two or three hundred yards beyond the crossing, she noticed that the man was following her on foot, evidently having traveled briskly, and she had ridden but little further when he came hurriedly up behind her and caught her riding-skirt. She immediately uttered an outcry and urged on her horse, and the man, without having spoken, fled in another direction. The prosecutrix on the trial identified the defendant. This was all the evidence. The jury convicted the accused. He moved for a new trial because of the

> insufficiency of the evidence, and the motion being overruled, appeals....
>
> The evidence is insufficient to support the verdict of the jury. We may conjecture the purpose of the defendant to have been to commit a rape, but, on the facts disclosed, it is conjecture only, and not an inference reasonably drawn from the evidence. The probabilities may be greater that a rape was intended rather than robbery or murder; but mere probability of guilt of a particular crime, and that, too, springing more from instinct than from proved facts, cannot support a verdict of guilty.
>
> There is great danger of improper convictions in cases of this character, and, while the court should not for that reason invade the province of the jury, the danger admonishes us of the necessity of standing firmly upon the right and duty of proper supervision and control of them.
>
> *Id.* at 326.

**25.** *Fann v. State,* 696 S.W.2d 575, 576 (Tex. Crim.App.1985).

**26.** *Megas v. State,* 68 S.W.3d 234, 240 (Tex. App.-Houston [1st Dist.] 2002, pet. ref'd)

**27.** 696 S.W.2d at 576.

against their will and the taking of them to some other, unknown places was sufficient for the jury to conclude that the offense was committed as charged to them in the court's instructions, and is sufficient to support their verdict." [28]

In *Megas v. State*, the evidence was similarly concrete:

> Linda Tyler observed appellant holding onto Tanner with one hand while beating her with the other. Tyler also saw Tanner running away from the car and attempting to jump over the barricade. When Tyler pulled over to render aid and began honking her horn, appellant stopped hitting Tanner, dragged her into the car, and drove away.[29]

The First Court of Appeals held that, from this evidence, "a jury could infer that Tanner was attempting to escape, and that appellant substantially interfered with her liberty by assaulting her and forcing her back into the car." [30]

In this case there is no such evidence of an intent to isolate. There was no car waiting around the corner.[31] There were no ropes in Laster's pocket. He did not even use both hands. He did not spring out from some hiding place to grab Beatrice.[32] He did not state any intention.[33] His conduct—except for grabbing Beatrice around the waist—was wholly ambiguous as to his possible future intent.[34] As the California Supreme Court once noted,

---

28. *Id.*

29. 68 S.W.3d at 239.

30. *Id.*

31. *People v. Fields*, 56 Cal.App.3d 954, 956, 129 Cal.Rptr. 24 (Cal.Ct.App.1976) ("Where, as here, a strange man seizes the person of a young girl on a residential street and orders her to get into a vehicle whose motor is running, the specific intent and the affirmative act required to constitute the crime of attempted kidnaping are adequately manifested.").

32. *See People v. Lamkey*, 240 Ill.App.3d 435, 181 Ill.Dec. 333, 608 N.E.2d 406, 409–10 (1992) (the defendant jumped out of a doorway to grab a ten-year-old girl walking home from school, pulled her into a hallway, pushed her against the wall, and sexually assaulted her; nevertheless, aggravated kidnapping conviction reversed, in part because crime occurred "in the vestibule of a building located only a couple of steps away from one of the busiest thoroughfares in Chicago," and defendant "remained within public view in the vestibule in an area clearly visible to anyone walking or driving down the street.").

33. *See People v. Cruz*, 296 A.D.2d 22, 25, 745 N.Y.S.2d 528 (N.Y.App.Div.2002) (evidence sufficient to support attempted kidnapping where defendant approached the five-year-old boy, told him, "I want to take you home," and

grabbed him, clearly indicating that his objective was abduction); *People v. Martinez*, 20 Cal.4th 225, 83 Cal.Rptr.2d 533, 973 P.2d 512, 523 (1999) (attempted kidnapping of a person under the age of 14 supported by evidence that "[W]hen the defendant grabbed Janet, he demanded she take him to Ramona, who had escaped to an apartment complex located on the other side of a parking area behind the house").

34. I could find only one American case in which, under facts similar to these, a court upheld an attempted kidnapping conviction against a claim that the conviction was obtained against the overwhelming weight of the evidence. In *Hersick v. State*, 904 So.2d 116 (Miss.2004), the evidence showed that

> An eleven-year old girl and her eight-year-old brother finished shopping at the Wal–Mart in Lucedale and raced to the nearby Winn–Dixie where their parents were grocery shopping. Larry Hersick, a transient, was sitting outside the Wal–Mart on a block of concrete. As the children raced past Hersick, he grabbed the girl by her upper right arm and pulled her a distance of about five to ten feet into the parking lot. The girl jerked away from Hersick and ran to the Winn–Dixie with her brother.
>
> The girl's father called the police, who rushed to the Wal–Mart to find Hersick still sitting on the block of concrete. Hersick was arrested, indicted, tried and convicted

The reason for requiring evidence of a direct act, however slight, toward consummation of the intended crime, is ... that in the majority of cases up to that time the conduct of the defendant, consisting merely of acts of preparation, has never ceased to be equivocal.... [S]o long as the equivocal quality remains, no one can say with certainty what the intent of the defendant is.[35]

Oftentimes facts do speak for themselves. But with the offense of criminal attempt, the established facts must be highly indicative of the defendant's intent to commit a specific crime.[36] These facts, even viewed in the light most generously and favorably to the State, are fatally equivocal and ambiguous.[37] I conclude that no rational juror could find, beyond a reasonable doubt, that, at the moment appellant grabbed Beatrice, he had the specific intent to secrete or hold her in a place where she was unlikely to be found.[38]

---

of attempted kidnaping, and sentenced to ten years' imprisonment.
*Id.* at 120. The legal analysis by the Supreme Court of Mississippi was contained in one sentence: "Accepting as true all the evidence in this case which supports the conviction, we are unable to say that the conviction was against the overwhelming weight of evidence. This claim is therefore without merit." *Id.* at 127. This analysis is too succinct to be useful.

**35.** *People v. Miller,* 2 Cal.2d 527, 42 P.2d 308, 310 (1935).

**36.** *See, e.g., United States v. Cruz–Jiminez,* 977 F.2d 95, 101–02 (3d Cir.1992) (stating that many federal courts of appeals have held that in order to support an attempt conviction "the prosecution must prove: (1) the intent, or kind of culpability otherwise required, to engage in the criminal conduct; and (2) conduct constituting a 'substantial step' toward commission of the substantive offense that strongly corroborates the criminal intent"); *United States v. Oviedo,* 525 F.2d 881, 884–85 (5th Cir.1976) ("When the question before the court is whether certain conduct constitutes mere preparation which is not punishable, or an attempt which is, the possibility of error is mitigated by the requirement *that the objective acts of the defendant evidence commitment to the criminal venture and corroborate the mens rea.* To the extent that this requirement is preserved it prevents the conviction of persons engaged in innocent acts on the basis of a mens rea proved through speculative inferences, unreliable forms of testimony, and past criminal conduct.") (internal citation omitted); *United States v. Mandujano,* 499 F.2d 370, 376 (5th Cir.1974) (explaining that, to constitute criminal attempt, "First, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting.... Second, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent.").

**37.** The prosecutor argued to the jury that these facts did speak for themselves: "there's only a couple of reasons why a grown man would try to steal away a little girl, to physically abuse her or sexually abuse her. Those are two of the six or seven options of the intent that's required in this case. You can infer those, intent. And that'll get you there."

**38.** Defense counsel argued just that at his motion for directed verdict:

[T]he State has failed to provide any proof or evidence that it was Mr. Laster's intent to abduct the child.
And if you'll recall, abduct has a very specific meaning under the purposes of the kidnapping statute. And that says that a person means to secrete or secret or hold him in a place where he's not likely to be found.... There's been no testimony to indicate that Mr. Laster had any specific intent to take this child anywhere, let alone to a place where she couldn't be found.

Counsel added that "there's been no evidence presented by either, in the State's case or on any kind of rebuttal, that would show that any of these aggravating factors were present." Counsel objected to the inclusion of the attempted aggravated kidnapping charge "on the basis that I do not believe there's been sufficient evidence presented to warrant that charge." He is correct unless one accepts the

I would reverse the judgment of the court of appeals, modify the trial court's conviction from an attempted aggravated kidnapping to one for unlawful restraint, and remand the case for a new punishment hearing.[39] The jury was charged on the lesser-included offense of unlawful restraint, and the evidence is clearly sufficient to support it.[40]

prosecutor's proposition that, as a matter of law, there are only two reasons why any grown man "would try to steal away a little girl." I cannot accept that legal proposition.

39. I note that the State enhanced this offense with a prior conviction for aggravated kidnapping with threats of deadly force. If the facts underlying that prior conviction were even vaguely similar to those in the present case, evidence of that former offense would surely have been admissible and admitted in this case to establish appellant's intent. *See Plante v. State,* 692 S.W.2d 487, 491–92 (Tex. Crim.App.1985).

40. *Haynes v. State,* 273 S.W.3d 183 (Tex. Crim.App., 2008) ("an appellate court may in cases like this reform a judgment to reflect a conviction for the lesser-included offense when that lesser-included offense was submitted in the jury charge").