# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00574-CR

**Andrew James Adkison, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
### NO. 67,766, HONORABLE JOE CARROLL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Andrew James Adkison guilty of injury to a child and assessed sentence at twenty years in prison. On appeal, he contends that the evidence was insufficient to support the jury's verdict. We will affirm the judgment of conviction.

### Standard of review

When reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The sufficiency of the evidence is measured by reference to the elements of the offense as defined by a hypothetically correct jury charge for the case. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009).

In determining the sufficiency of the evidence, we must consider all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the

prosecution or the defense. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318. We must defer to the jury's determinations of the witnesses' credibility and the weight to be given their testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). The jury, as the exclusive judge of the facts, is entitled to weigh and resolve conflicts in the evidence and draw reasonable inferences therefrom. *Clayton*, 235 S.W.3d at 778; *see* Tex. Code Crim. Proc. art. 38.04. Thus, when faced with a record of historical facts that supports conflicting inferences, we must presume that the trier of fact resolved any such conflicts in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326.

Circumstantial evidence is as probative as direct evidence in establishing guilt and may alone be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). So long as "the verdict is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable." *Laster v. State*, 275 S.W.3d 512, 523 (Tex. Crim. App. 2009). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *Allen v. State*, 249 S.W.3d 680, 688 (Tex. App.—Austin 2008, no pet.).

A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes a child serious bodily injury. Tex. Penal Code § 22.04(a)(1).

**Testimony and Evidence**

In 2011, appellant, the victim (a three-and-one-half-month-old child), the child's mother (N.C.), and appellant's cousin (Trevor) shared a house. Appellant was the child's primary caregiver. The child was hospitalized on January 5, 2011, with a serious bodily injury, suffering a skull fracture, brain injury, internal bleeding, and external swelling on the left side of her head. The injury was cutting off the blood and oxygen supply to that part of her brain, causing some parts of her brain to die. She was having seizures and needed intubation to ensure stable breathing. She had a fairly recently broken rib on her left side and two older, healing rib fractures. She had a linear abrasion on her neck that was beginning to heal and some scratches over her eyelids.

*The child's mother*

N.C. was eighteen years old and pregnant when she was transferred to Fort Hood and met appellant in 2010. She said he told her he was 27 and had been in the army for 10 years. N.C. needed to move off base when she had the baby, and appellant wanted to help her with the baby, so they moved into a house. Appellant left the army in the fall of 2010, and his cousin, Trevor, moved in with them. N.C. testified that 18-year-old Trevor was supposed to be looking for a job but spent his time on the computer or sleeping.

The child was born in September 2010. She developed torticollis, a stiffening of the neck muscles, which required physical therapy involving mostly stretching exercises. N.C. testified that the therapy was working.

In January 2011, N.C.'s typical day involved getting up before 6 a.m. for physical training, returning home, then going to work by 9, returning for lunch between 11:30-1 p.m., then

3

leaving work by 4:30 p.m. Appellant had night duty with the baby unless N.C. did not have to work the next day.

N.C. testified that appellant told her that an incident occurred on Tuesday, January 4, 2011, involving the child and his dog. The child was standing and holding his hand, and the dog walked in and either bumped her or scared her so that she fell onto the carpet and hit her head. N.C. testified that the child seemed normal until Wednesday at lunch. On cross-examination, N.C. said she had not heard a version of the story where the dog supposedly jumped up and appellant shielded the child.

N.C. testified that, on the morning of Wednesday, January 5, 2011, she overslept and rushed to get to work, so she did not see her child until lunch. She said that when she walked into the child's room shortly after 11 a.m. everything seemed wrong. Appellant was holding the child, but she was crying differently than ever before and was uncharacteristically not supporting her own neck. N.C. testified that appellant told her he did not know what happened to the child. He told her he noticed that the child's cry was unusual that Wednesday morning. N.C. said she held the child trying to see what was going on, then decided to seek medical care.

Appellant drove them to the base hospital. On the way, the child's eyes were rolled to the back of her head and she continued to have the unusual cry. The base hospital put the child on a breathing machine, and the child had a seizure. Staff conducted a CAT scan and told N.C. that the child had a skull fracture, hemorrhaging, and brain damage on her left side. They transferred her to a civilian hospital, where examinations also revealed older injuries.

N.C. testified that appellant told her that police later grilled him and bullied him into giving a false confession, saying that he told police what they wanted to hear so they would let him

4

go.  N.C. learned that appellant had lied to her about his age—he was 23—and his length of service and career accomplishments.

***The doctor[1]***

Dr. David Hardy examined the child when she was transferred from the base hospital. He noted the symptoms described above and stated that his main concerns were her seizures, her brain injury, and her breathing.  He classified her as being in critical condition and said she could have died.  He talked to both N.C. and appellant.

Hardy testified that N.C. told him that the child was normal in the morning, but was abnormal at 11 a.m.  She had not noticed any injury to the child's neck before then.  She reported appellant's dog-running-into-child incident, but noted that the child did not cry or eat unusually until more than a day later.

Hardy testified that, in his opinion, the fall described in the dog incident would not have caused the skull fracture, the rib fracture, or the neck abrasion.  He testified that the skull fracture and the subdural bleeding on the left side could have come from one event or multiple events.  He said that the subdural required more force than a fracture.  He testified that a fall from a table could cause a skull fracture, but was not sufficient to cause a large subdural that causes brain death and retinal hemorrhages.  Hardy opined that there was no known reason for the child to have a retinal hemorrhage other than whatever caused the major closed-head injury.  He testified that even the shoving incident involving the dog was not sufficient as described to cause her brain injuries. It involved insufficient force to cause the injuries as described, and if it had somehow caused the

---

[1] A nurse from the hospital testified about her observations made while she took photographs of the child's condition.  She did not offer opinions regarding causation.

5

injuries, her symptoms would have appeared much sooner than Wednesday morning. He testified that such an injury could come from striking the child with a blunt object, including a hand, a floor, or a wall. He said it would take more to cause these injuries than accidentally bumping the child's head against a doorway while walking through the door.

Hardy testified that whatever caused the child's brain injuries must have occurred no more than "a couple" of hours before he examined her early on Wednesday afternoon. He testified that the skull fracture also appeared to be fairly recent based on the visible swelling. He opined that the skull fracture and the subdurals arose from the same cause only a few hours before he examined her. Based on appellant's report that the child was normal at the 3 a.m. feeding, Hardy opined that the child was injured sometime between 3 a.m. and 11 a.m. He testified that he believed that the child's injuries were inflicted, abusive injuries.

Hardy testified that the child's rib fractures were from different instances—one less than two weeks, one two weeks to a month, and the oldest more than a month. He testified that the rib injuries would not have come from the child being pushed into a crib but would require a continual pressure that compressed the child. He testified that this sort of rib injury most often comes from squeezing, as it requires a considerable amount of force.

### Law enforcement

Killeen Police Department Officer Troy Fulghum met N.C. and appellant at the hospital on January 5, 2011 and asked them to make written statements. They wrote out their individual statements without questioning from Fulghum. He also talked with medical personnel about the child's condition. Fulghum said he was concerned because appellant's statement did not

6

match up with the injuries the medical staff described. He also took pictures inside appellant's house that were later admitted into evidence.

Detective Fred Harris also met appellant at the hospital and went to the house to take pictures along with Fulghum and a CPS worker. The next day, Harris asked appellant to come to the police station to talk further about his written statement. Appellant signed a statement acknowledging that his appearance at the police station was voluntary and that he could leave at any time. Harris and appellant talked for about two hours. Harris confronted appellant about discrepancies between his story and the medical reports. Harris testified that, over the course of the interview, appellant's story began to change and better conform with the medical reports. Harris testified that appellant told him he "tossed" the child aside when the dog ran into the room, that her ribs hit the crib, and her head hit the metal pack-and-play. Appellant said that she had hit her head several times on the pack-and-play. Harris testified that appellant also told him that, at one point, he was so frustrated with the child's refusal to sleep that he folded part of a toy[2] so that her head was hanging until her face turned blue, which is when "he realized he was doing it wrong and he took her out." After appellant filled out a new written statement, Harris went to the house to get the "modified jungle gym activity toy that [appellant] had and he had said he used to wrap around [the child's] neck."

### *Appellant*

The jury had before them appellant's trial testimony and two statements he wrote for police. The jury also saw a videotape of appellant being questioned by Harris.

---

[2] The "toy," labeled in the exhibit volume as a "Baby Play Station," consists of a mat with attached flexible arches that arc over the mat and from which dangle items for the child to see and touch.

7

In the first statement, appellant wrote that on Monday morning at 3 a.m. he fed the child and played with her. He stood her up on the floor and held her arms. His dog—at the time, an 11-month-old husky weighing 100 pounds—came running into the room. Because the dog likes to jump on people, appellant lifted his elbow to stop him. In doing so, he let go of the child, who then fell the distance of her height to the carpeted floor. She did not scream and was normal until Wednesday morning, when she woke up screaming differently than she normally does. She would not eat and would not take a pacifier. He noticed that she was limp, so he applied pressure to her fingers to check for reaction. She reacted, so he thought she was just tired. He picked her up and put her in bed with him to sleep. She woke up screaming differently than usual. Her eyes were rolled back in her head, she was not supporting her head as usual, and she could not be comforted. When the child's mother arrived home for lunch, they took the child to the hospital.

In the second statement, appellant began with the dog incident, but wrote that he pushed the child out of the way to protect her, but "she went farther and more forcibly than I had intended. She hit the crib." He also wrote that he had previously hit her head against other things unintentionally and had noted a soft spot on her head. He did not think anything of it because she did not cry, and he figured it would heal. She would not go to sleep, however, so he put her neck in a plastic ring of a toy hoping she would pass out. She started to turn blue, so he picked her up. He said that he did not want to hurt her, but he was tired and frustrated with her mother for not helping more with her care. He described his actions as completely out of character and reiterated his regret. Near the end of his statement, he wrote: "I just need help with taking care of her. [N.C.] is never actually there helping out with it. This is what happened. The [toy he used to choke the child] and the roughness of the situation is what caused [the child] to be in this predicament. The

8

above statement is true and correct to the best of my knowledge. I am 27 years old and do read and write the English language."

In his trial testimony, appellant's version of the incident with the dog more closely resembled his first written statement. Appellant testified that he was helping the child stand up after the 3 a.m. feeding on Monday when his dog ran into the room. Appellant testified that he held his arm up to protect the child from the dog, and the child fell on her left side. He added details about noticing a small scratch on the back of her head, a line on her throat that he thought was a "milk line," and scratches above her eyes from what he believed were her own fingernails. He described the soft spot on her head as being like a bruise on her head. He said he had accidentally bumped her head about a month earlier on the right side.

Tuesday, the child seemed fine. Appellant watched a movie late and did not put her to bed until 1 a.m. She woke up at 3 a.m. on Wednesday morning for her usual feeding. The child was fine and stayed up less than an hour. She woke up with a distressing cry at 4:30-5 a.m., but was calm by the time he got to her crib. Appellant testified that Trevor was up all night. Appellant testified that the child woke up again at 7 a.m or so on Wednesday with a cry that did not sound right. He picked her up and noticed that her head fell backwards. He tried to open her eyes and saw that the whites of her eyes looked wrong. He noted some swelling on her head. He said he pinched her fingernail to check for reaction as he had been trained to do and got one, but still felt something was wrong. When the child's mother came home, he told her his concerns and appellant testified that they went to the base hospital by 8 a.m. By 11 a.m., the child was transferred to a civilian hospital in Temple. Hospital records, however, showed that they did not arrive at the army hospital until 12:09 p.m.

The jury saw the videotape of appellant being questioned by police. He concedes that his story changed over the course of his hour and forty-five minute interview. He testified that he lied about his age to police, saying he was 27 years old when he was only 23—to be consistent with the age he had told the child's mother to impress her. He testified that he lied to police about having been an army ranger for the same reason. He testified that he admitted injuring the child because he felt like the policeman was bullying him. He testified that he was stressed from the events of the day and "wanted to say whatever they wanted me to say so I could get out of there, get back to the hospital." Appellant said he decided to lie when he felt threatened by the policeman. In court, he denied that he ever tossed the child or used the toy to strangle the child as he said in his statement. He testified that he invented the story about strangling her unconscious with the toy because the toy "was the most harmless thing I could think of" that could not have caused her brain injuries. He testified that he did not believe that he lied to medical personnel, although he told the emergency room personnel that the child had fallen on her right side when the dog ran into the room. He theorized that he had been confused when making that statement, reiterated that he did not harm the child, and said he did not know who did.

## Discussion

The challenge on appeal is to the sufficiency of the evidence that appellant caused the serious bodily injury and did so with the requisite intent. There is no dispute that the child suffered serious bodily injuries, but there was no testimony or evidence directly showing that appellant was responsible for the child's most serious injuries. To have found him guilty, the jury must have inferred from the evidence before it that appellant did more than he admitted to the child. We must determine whether those inferences were reasonable under the record.

The jury heard Dr. Hardy's testimony that the child's injuries most likely occurred within a few hours before 11 a.m. on January 5, 2011. Dr. Hardy testified that the nature of the child's injuries strongly indicated that they were intentionally inflicted. Appellant, N.C., and Trevor were the only people said to be in the house with the child during that time. There was no evidence of intruders. While Trevor was reportedly awake through the preceding night, there is testimony that N.C. was either asleep or out of the house for almost the entire morning when the child was injured. There is no evidence of N.C. or Trevor hurting the child at any time.

Appellant, by contrast, admitted to involvement in events that injured the child. Review of his conversational statements, formal statements, and trial testimony reveals variations. Appellant's involvement in the dog incident morphed from the dog running into the child, to appellant's intended protection of the child from the dog causing/allowing the child to fall, to appellant tossing the child to protect her from the dog, the latter of which caused her ribs to hit the crib and her head to hit a metal pack and play. He admitted noticing a soft spot on the child's head after the dog incident. He admitted to Detective Harris that he used the activity mat to choke the child unconscious, though he said that was out of character and later recanted that statement. In his second statement, appellant also admitted to frustration with the child's refusal to sleep as well as N.C.'s inadequate assistance, and testified that those factors caused him to choke the child to sleep.

Appellant's testimony revealed credibility issues. He lied about his age to the police in order to be consistent with the lies he told to N.C. about his background. He changed his story about the dog incident fairly significantly from version to version. He told the story about using the activity mat to choke the child, then later asserted that the asphyxiation story was a lie he thought was "harmless" and would cause the police to release him. Regardless of which is true, he lied on at least one of those occasions. At trial he testified, "I did not injure this child at all. I did not." The

11

jury saw him talking to Detective Harris on video, saw him testify in the courtroom, and assessed his credibility accordingly.

We conclude that the record provides sufficient evidence to support the judgment of conviction. Appellant was the primary caregiver and in the house during the time the injuries occurred. He expressed frustration with the child's refusal to sleep and the lack of help from the child's mother. At one point, he admitted to choking the child to sleep. Appellant admitted to actions that were similar in type, if less forceful, to actions that could cause the head injuries the child sustained. Dr. Hardy testified that the child's injuries had to be inflicted intentionally.

Viewing the record in the light most favorable to the verdict and deferring to the jury's credibility choices as required, *Jackson*, 443 U.S. at 318; *Brooks v. State*, 323 S.W.3d at 899, we conclude that we cannot say that the jury acted unreasonably by concluding based on this record that appellant intentionally, knowingly, recklessly, or with criminal negligence, caused the child serious bodily injury. Tex. Penal Code § 22.04(a)(1).

## Conclusion

We affirm the judgment of conviction.

_____

Jeff Rose, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed: August 23, 2013

Do Not Publish

12